

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-11-2004

# Sabree v. Richman

Precedential or Non-Precedential: Precedential

Docket No. 03-1226

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Sabree v. Richman" (2004). *2004 Decisions.* Paper 667.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/667

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-1226

———————

HASSAN SABREE, By his Mother and
Next-Friend, Hana Sabree;
CATHERINE MEADE, By her Father
and Next-Friend, Robert A.
Meade; JOSEPH FRAZIER, By his
Mother and Next-Friend,
Patricia Frazier, for Themsleves and All
Others Similarly
Situated

v.

* ESTELLE B. RICHMAN, In Her
Official Capacity as Secretary of
the Department of Public Welfare of the
Commonwealth of
Pennsylvania

Hassan Sabree, Catherine
Meade, and Joseph Frazier,
                    Appellants

*{Substitution Pursuant to Clerk's
Order dated 3/28/03
and F.R.A.P. Rule 43(c)}

———————

APPEAL FROM THE UNITED
STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF

PENNSYLVANIA
D.C. Civil No. 02-cv-03426
District Judge:  The Honorable Herbert J.
Hutton

———————

Argued:  September 11, 2003

———————

Before: ALITO, BARRY, and AMBRO,
            Circuit Judges

(Opinion Filed: May 11, 2004)

———————

Stephen F. Gold, Esq. (Argued)
125 South 9th Street
Suite 700
Philadelphia, PA  19107
            -AND-
Ilene W. Shane, Esq.
Disabilities Law Project
1315 Walnut Street
Suite 400
Philadelphia, PA  19107

Attorneys for Appellants

Doris M. Leisch, Esq. (Argued)
Commonwealth of Pennsylvania
Department of Public Welfare
1400 Spring Garden Street
State Office Building
Philadelphia, PA  19130
            -AND-
John A. Kane, Esq.
Commonwealth of Pennsylvania
Office of Legal Counsel

1

Department of Public Welfare
P.O. Box 2675
Health & Welfare Building
Seventh & Forster Streets
Harrisburg, PA   17120

Attorneys for Appellees


Sarah Somers, Esq.
National Health Law Program
211 North Columbia Street
Chapel Hill, NC  27514

Attorney for Amicus-Appellants

------------

OPINION OF THE COURT

------------


BARRY, Circuit Judge

## I.  **INTRODUCTION**

When Congress offers money to the states, it often imposes conditions on acceptance.  States welcome federal funding to help underwrite many of the core services they provide to their citizens. Education, healthcare, and public safety, to name a few, while typically state concerns, are usually funded in part by federal dollars that come with strings attached.  This case raises the question–not new, but of first impression in this Court following *Gonzaga University v. Doe*, 536 U.S. 273 (2002)–of what happens when a state allegedly fails to live up to the conditions imposed on it by Congress.

Plaintiffs are a class of mentally retarded adults in need of medical services from an intermediate care facility for persons with mental retardation ("ICF/MR services").  Although they qualify for state assistance to obtain these services under the Medicaid Act, that assistance has not been forthcoming.  In an effort to force Pennsylvania to provide the needed services, plaintiffs, pursuant to 42 U.S.C. § 1983, sued the Secretary of the Pennsylvania Department of Public Welfare.  Pennsylvania argues that it would provide assistance if it could but that it cannot, and that, in any event, the sole remedy for its non-compliance with the Medicaid Act is the suspension or revocation of funding from Congress.  We disagree.[1]

------------

[1]There appears to be a disagreement among our sister courts of appeals as to whether, pursuant to Medicaid, a state must merely provide financial assistance to obtain covered services, or provide the services themselves.  *See Bruggeman v. Blagojevich*, 324 F.3d 906, 910 (7th Cir. 2003) ("[T]he statutory reference to 'assistance' appears to have reference to financial assistance rather than to actual medical services, though the distinction was missed in *Bryson v. Shumway*, 308 F.3d 79, 81, 88-89 (1st Cir. 2002) and *Doe v. Chiles*, 136 F.3d 709, 714, 717 (11th Cir. 1998).").  The only issue before us, however, is whether plaintiffs may sue Pennsylvania under 42 U.S.C. § 1983 to obtain the "assistance" for which

2

The District Court, relying heavily on *Gonzaga University*, concluded that Congress had not unambiguously conferred the rights that plaintiffs sought to vindicate under § 1983, and dismissed the suit.[2] *Sabree v. Houston*, 245 F. Supp. 2d 653, 659 (E.D. Pa. 2003). At first blush, language in *Gonzaga University* would appear to support that conclusion. In *Gonzaga University*, the Court foreclosed the ability of a student to enforce, by means of § 1983, provisions of the Family Educational Rights and Privacy Act of 1974 ("FERPA").[3] *Gonzaga Univ.*, 536 U.S. at 283. The Chief Justice, writing for the Court, stated emphatically: "We now reject the notion that our cases permit anything short of an *unambiguously conferred right* to support a cause of action brought under § 1983." *Id.* (emphasis added).

The Court, no doubt, has set a high bar for plaintiffs. Nonetheless, after having considered the relevant provisions of the Medicaid Act against the backdrop of *Gonzaga University,* we are convinced that Congress unambiguously conferred the rights which plaintiffs here seek to enforce. Accordingly, we will reverse the order of the District Court.

## II. **DISCUSSION**

Title XIX of the Social Security Act, codified at 42 U.S.C. §§ 1396-1396v and popularly known as the "Medicaid Act," established a "cooperative federal-state program under which the federal government furnishes funding to states for the purpose of providing medical assistance to eligible low-income persons." *Pa. Pharm. Ass'n v. Houstoun*, 283 F.3d 531, 533 (3d Cir.

they qualify. To resolve this issue we need not, and do not, address the remedy that might be available to plaintiffs, but leave that to the District Court in the first instance.

[2]Section 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Rights conferred by federal statute are enforceable under § 1983. *Maine v. Thiboutot*, 448 U.S. 1, 4-8 (1980).

[3]The relevant FERPA language mandated:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . . ) of students without the written consent of their parents to any individual, agency, or organization.

20 U.S.C. § 1232g(b)(1).

2002). States are not required to participate in the program, but states that do accept federal funding must comply with the Medicaid Act and with regulations promulgated by the Secretary of Health and Human Services ("HHS"). Participating states must devise and implement a state medical assistance plan that is approved by the Secretary of HHS. 42 U.S.C. § 1396; 42 C.F.R. § 430.10. A state that fails to comply with its medical assistance plan runs the risk of having its funding revoked by the Secretary. 42 U.S.C. § 1396c.

There is no dispute that plaintiffs qualify for ICF/MR services under Pennsylvania's medical assistance plan. Nor is it disputed that plaintiffs have languished on waiting lists for years, unable to obtain these services. The only dispute, and the one now before us, is whether plaintiffs may sue Pennsylvania under § 1983 to enforce the provisions of Title XIX that require (1) a state to provide medical assistance covering ICF/MR services, and (2) to do so with "reasonable promptness." 42 U.S.C. §§ 1396a(a)(8),[4] 1396a(a)(10),[5] and

1396d(a)(15).[6]

That plaintiffs merit sympathy does not escape our notice, but neither does it govern our reasoning. Rather, *Gonzaga University* provides the

shall have opportunity to do so, and that *such assistance shall be furnished with reasonable promptness to all eligible individuals . . . .*

42 U.S.C. § 1396a(a)(8) (emphasis added).

[5]Section 1396a(a)(10) provides in relevant part: "A State plan for medical assistance *must . . . provide . . .*for making medical assistance available, . . . *to . . . all* [eligible] *individuals . . . .*" 42 U.S.C. § 1396a(a)(10) (emphasis added).

[6]Section 1396d(a)(15) provides in relevant part:

For purposes of this title [42 U.S.C. §§ 1396 et seq.] . . . [t]he term "medical assistance" means payment of part or all of the cost of the following care and services . . . for individuals . . . who are [eligible:] . . . services in an intermediate care facility for the mentally retarded . . . .

42 U.S.C. § 1396d(a)(15).

[4]Section 1396a(a)(8) provides in relevant part:

A State plan for medical assistance *must . . . provide* that *all individuals* wishing to make application for medical assistance under the plan

4

dispassionate lens through which this matter must be viewed. A three-step analysis is required. First, we must examine *Gonzaga University* to determine the essential characteristics of an "unambiguously conferred right." Second, we must assess whether the statutory language of Title XIX imparts an "unambiguously conferred right." Third, we must determine–if an individual right has been unambiguously conferred–whether Congress has precluded individual enforcement of that right. This analysis, which, as will become clear, is assuredly not for the timid, compels the conclusion that the provisions invoked by plaintiffs–42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10), and 1396d(a)(15)–unambiguously confer rights vindicable under § 1983.

**A.    *Gonzaga University v. Doe* and Unambiguously Conferred Rights – Step One**

As the Court explained more than twenty years ago, "[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 28 (1981). Nonetheless, as the Court observed in *Gonzaga University*, in some instances Congress has unambiguously conferred rights that may be vindicated by individual suits brought under §

1983.[7]

In *Gonzaga University*, the plaintiff sought to enforce conditions imposed on the State of Washington by

---

[7]We take as a given that when seeking redress under § 1983 for violation of a statutory right, a plaintiff need not establish that Congress intended to confer a remedy in addition to that right. *See, e.g., Gonzaga Univ.*, 536 U.S. at 284 ("Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes. Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983.").

That § 1983 provides a remedy for statutorily conferred rights "makes obvious sense." *Id.* at 285. While the creation of statutorily specific remedies would make our task easier, Congress has chosen to provide § 1983 as an all purpose remedy. Obviously, we cannot require a clear statement rule mandating the specification of a right to sue within the statutory text; to do so would effectively repeal § 1983. Instead, we must, as the Court demonstrates in *Gonzaga University*, examine the statutory text to determine whether Congress has unambiguously conferred an individual right.

5

FERPA.[8] "Congress enacted FERPA under its spending power to condition the receipt of federal funds on certain requirements relating to the access and disclosure of student educational records." *Gonzaga Univ.*, 536 U.S. at 278. Ultimately, the Court rejected the viability of plaintiff's claim because it concluded that in FERPA Congress had not "*intended to create a federal right.*" *Id.* at 283 (emphasis in original)*; see also id.* at 291 (Breyer, J., concurring) ("The ultimate question, in respect to whether private individuals may bring a lawsuit to enforce a federal statute, through 42 U.S.C. § 1983 or otherwise, *is a question of congressional intent.*") (emphasis added).

Accordingly, we must determine whether Congress intended to confer the rights claimed by plaintiffs. *Gonzaga University* instructs that congressional intent is manifest only when statutory language unambiguously confers such rights. *Id.* at 283. To determine what statutory language is necessary to confer rights unambiguously, we turn first to the cases in which the Court addressed statutory actions brought under § 1983. We then consider what the Court means in *Gonzaga University* when it requires "rights-creating language." *Id.* at 287.

### 1. Statutory Rights and 42 U.S.C. § 1983

Since *Pennhurst,* only twice has the Court recognized a congressional intent to confer statutory rights vindicable via § 1983: *Wright v. Roanoke Redevelopment & Housing Authority*, 479 U.S. 418 (1987), addressing the Public Housing Act; and *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990), addressing Title XIX of the Social Security Act. The Court has foreclosed § 1983 suits in two equally significant cases (in addition to *Gonzaga University*): *Suter v. Artist M.,* 503 U.S. 347 (1992), addressing the Adoption Assistance and Child Welfare Act of 1980; and *Blessing v. Freestone*, 520 U.S. 329 (1997), addressing Title IV-D of the Social Security Act.

While in *Gonzaga University* the Court "reject[ed] the notion that [its] . . . cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983," it carefully avoided disturbing, much less overruling, *Wright* and *Wilder*. *Gonzaga Univ.*, 536 U.S. at 283. Indeed, as the ensuing analysis will demonstrate, the Court relied on those cases in crafting *Gonzaga University*. Accordingly, we will assess the rights claimed by plaintiffs in light of *Wright*, *Wilder*, *Suter*, and *Blessing*, as construed by *Gonzaga University*.

### (a) *Wright v. Roanoke Redevelopment & Housing Authority*

In *Wright,* the Court permitted a § 1983 suit by tenants to recover past

---

[8]For the relevant FERPA language, see note 3, *supra*.

overcharges under a rent-ceiling provision of the Public Housing Act.[9]  As

explained in *Gonzaga University*, three factors motivated the *Wright* Court to conclude "that the provision unambiguously conferred 'a mandatory [benefit] focusing on the individual family and its income.'" *Gonzaga Univ.*, 536 U.S. at 280 (quoting *Wright*, 479 U.S. at 430).  First, "[t]he key to [the Court's] inquiry was that Congress spoke in terms that 'could not be clearer.'" *Id.*  Second, Congress "conferred entitlements 'sufficiently specific and definite to qualify as enforceable rights under *Pennhurst*.'" *Id.* (quoting *Wright*, 479 U.S. at 432).  Third, "the federal agency charged with administering the Public Housing Act 'had never provided a procedure by which tenants could complain to it about the alleged failures [of state welfare agencies] to abide by [the Act's rent-ceiling provision].'" *Id.* (quoting *Wright*, 479 U.S. at 426).

### (b)  *Wilder v. Virginia Hospital Ass'n*

In *Wilder*, the Court permitted a § 1983 action brought by health care providers to enforce a reimbursement provision of Title XIX of the Social Security Act, the same Title at issue

---

[9]The Public Housing Act provided in relevant part:

> Dwelling units assisted under this chapter shall be rented only to families who are lower income families at the time of their initial occupancy of such units. Reviews of family income shall be made at least annually.  *A family shall pay* as rent for a dwelling unit assisted under this chapter (other than a family assisted under section 1437f(o) of this title) the highest of the following amounts, rounded to the nearest dollar:
>
> (1) 30 per centum of the family's monthly adjusted income;
>
> (2) 10 per centum of the family's monthly income; or
>
> (3) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency

> to meet the family's housing costs, the portion of such payments which is so designated.

42 U. S. C. §  1437a (1982 ed. and Supp. III) (emphasis added).

7

here.[10] According to *Gonzaga*

*University*, the *Wilder* Court was persuaded because the relevant Medicaid provisions: (1) "explicitly conferred specific monetary entitlements upon the plaintiffs"; (2) "required States to pay an 'objective' monetary entitlement to individual health care providers, with no sufficient administrative means of enforcing the requirement against States that failed to comply"; and (3) because "Congress left no doubt of its intent for private enforcement." *Gonzaga Univ.*, 536 U.S. at 280-81 (quoting *Wilder*, 496 U.S. at 522-23).

### (c) *Suter v. Artist M.*

In *Suter*, the Court foreclosed an action under § 1983 brought by a class of parents and children who sought to enforce provisions of the Adoption Assistance and Child Welfare Act, which required that states have a "plan" to make "reasonable efforts" to keep children out of foster homes.[11]

---

[10]Title XIX of the Social Security Act provided in relevant part:

> A State plan for medical assistance *must . . . provide . . .* for payment . . . of hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State . . .) which the State funds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access . . . to inpatient hospital services of adequate quality.

42 U.S.C. § 1396a(a)(13)(A) (1982 ed.,

Supp. V) (emphasis added).

[11]In *Suter*, the Court considered provisions of the Adoption Assistance and Child Welfare Act, which provided in relevant part:

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides that the plan shall

8

According to *Gonzaga University*, the *Suter* Court recognized that because the Adoption Act "conferred no specific, individually enforceable rights, there was no basis for private enforcement, even by a class of the statute's principal beneficiaries." *Gonzaga Univ.*, 536 U.S. at 281 (citing *Suter*, 503 U.S. at 357). Writing for the Court in *Suter*, the Chief Justice explained:

> Careful examination of the language . . . does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term "reasonable efforts" in this context is at least as plausibly read to impose only a rather generalized

> be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them; . . .[and] provides that, in each case, *reasonable efforts* will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home . . . .

42 U. S. C. § 671(a)(3), (15) (1988 ed. and Supp. I) (emphasis added).

duty on the State, to be enforced not by private individuals, but by the Secretary in the manner [of reducing or eliminating payments].

*Suter,* 503 U.S. 363 (quoted approvingly by *Gonzaga Univ.*, 536 U.S. at 281).

### (d) *Blessing v. Freestone*

In *Blessing*, the Court rejected the claim under § 1983 of five mothers whose children were eligible to receive child support services from the State of Arizona pursuant to Title IV-D of the Social Security Act.[12] Title IV-D of the Social Security Act enumerated various entitlements.[13] Without claiming any

[12] 42 U.S.C. §§ 651-69 (1996) (as amended by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105 ("PRWOR Act")).

[13] See, for example, the following provision:

> A State plan for child and spousal support *must . . . provide* that the State will . . . provide services relating to the establishment of paternity . . . with respect to . . . *each child* [who is eligible] . . . and . . . enforce any support

specific rights under Title IV-D, the plaintiffs asserted that "they had an enforceable individual right to have the State's program achieve 'substantial compliance' with the requirements of Title IV-D," as required of the State in Title IV-A.[14]  *Blessing*, 520 U.S. at 333.

In *Gonzaga University,* the Court explained the logic of the unanimous *Blessing* holding:

> Because the provision focused on "the aggregate services provided by the State," rather than "the needs of any particular person," it conferred no individual rights and thus could not be enforced by § 1983. We emphasized: "To seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*."

*Gonzaga Univ.*, 536 U.S. at 281 (quoting *Blessing*, 520 U.S. at 340 (emphasis in original)).  That *Blessing* garnered unanimous support is not surprising: it is an easy case.  The plaintiffs never asserted any individual rights but, instead, attempted to enforce Congress's right to demand "substantial compliance" with the terms of a conditional grant of money.  To have allowed the action to proceed would have transformed § 1983 from a vehicle to vindicate *personal* rights into a *qui tam* mechanism.

To evaluate whether Congress had conferred enforceable *individual* rights in a statute, the *Blessing* Court drew on *Wright*, *Wilder*, and *Suter*, and formulated a three-prong test: a statute must (1) be intended by Congress to benefit the plaintiff, (2) not be "vague and amorphous," and (3) impose an unambiguous "binding obligation on the States."  *Blessing*, 520 U.S. at 340-41. While in *Gonzaga University* the Court

---

> obligation established with respect to [eligible children] . . . .

42 U.S.C. § 654(4)(A)-(B) (1996) (as amended by the PRWOR Act) (emphasis added).

[14]Title IV-A of the Social Security Act provided in relevant part:

> If a State program . . . is found . . . not to have *complied substantially* with the requirements of [the program], and the Secretary determines that the program is not *complying substantially* with such requirements at the time the finding is made, the Secretary shall reduce the grant payable to the State . . . .

42 U.S.C. § 609(a)(8) (1996) (as amended by the PRWOR Act) (emphasis added).

10

did not abandon this test, it did dispel

> [the] confusion [that] has led some courts to interpret *Blessing* as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action.

*Gonzaga Univ.*, 536 U.S. at 283. The Court clarified and "emphasize[d] that it is only violations of *rights*, not *laws*, which give rise to § 1983 actions." *Id.* at 283 (citing *Blessing*, 520 U.S. at 340 (emphasis in original)).

Significantly, in *Blessing* the Court did not decide that Title IV-D does not, in fact, confer individual rights. Rather, the Court concluded that plaintiffs had failed to assert any specific rights, instead relying on the general requirement that Arizona "substantially comply" with its Child Welfare Plan. *Blessing*, 520 U.S. at 345-46 ("We do not foreclose the possibility that some provisions of Title IV-D give rise to individual rights. . . . [But,] it is not at all apparent that respondents sought any relief more specific than a declaration that their 'rights' were being violated and

an injunction forcing Arizona's child support agency to 'substantially comply' with all of the provisions of Title IV-D."). Consequently, the Court remanded the case for a determination of whether specific provisions of Title IV-D gave rise to individual rights. *Id.* at 346.

## 2. Rights-Creating Language

To confer rights, Congress must use "rights-creating language." *Gonzaga Univ.*, 536 U.S. at 287. Such language must clearly impart an "individual entitlement," and have an "unmistakable focus on the benefitted class." *Id.* (quoting *Blessing*, 520 U.S. at 343, and *Cannon v. University of Chicago,* 441 U.S. 677, 690-93 (1979)). *Cf. Alexander v. Sandoval,* 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons'") (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)).

The Chief Justice invoked the implied private right of action cases to demonstrate the type of "rights-creating terms" that unambiguously confer rights.

> "[T]he question whether Congress . . . intended to create a private right of action [is] definitively answered in the negative" where "a statute by its

11

terms grants no private rights to any identifiable class." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 576 (1979)). For a statute to create such private rights, its text must be "phrased in terms of the persons benefitted." *Cannon v. University of Chicago,* 441 U.S. 677, 692, n.13 (1979). We have recognized, for example, that Title VI of the Civil Rights Act of 1964[15] and Title IX of the Education Amendments of 1972[16] create individual rights because those statutes are phrased "with an *unmistakable focus* on the benefitted class." *Id.,* at 691 (emphasis added).

*Gonzaga Univ.*, 536 U.S. at 283-84.

As with implied private rights of action, statutory claims under § 1983 must be premised on an unambiguous articulation and conferral of rights by Congress.[17] "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286. With this in mind, the Court evaluated FERPA. First, and most importantly, the Court contrasted the "individually focused" "rights-creating" language of Title VI and IX ("no person shall be subjected to discrimination")[18] with FERPA's general provisions addressing the Secretary of Education ("no funds shall be made available" to

---

[15]Title VI provides: "*No person* in the United States *shall . . .* be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race, color, or national origin. 42 U.S.C. § 2000d (emphasis added).

[16]Title IX provides: "*No person* in the United States *shall,* on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added).

---

[17]The distinction between implied private rights of action and § 1983 private rights of action rests not in the articulation of rights, but in the availability of a remedy. *Gonzaga Univ.*, 536 U.S. at 285 ("[T]he initial inquiry [in a private right of action under § 1983]–determining whether a statute confers any right at all–is no different from the initial inquiry in an implied right of action case, the express purpose of which is to determine whether or not a statute 'confers rights on a particular class of persons.'") (quoting *California v. Sierra Club*, 451 U.S. at 294).

[18]*See* n.15 & n.16, *supra*.

12

any "educational agency or institution" which has a prohibited "policy or practice.").[19] *Gonzaga Univ.*, 536 U.S. at 287. The Court noted that "FERPA's nondisclosure provisions . . . speak only in terms of institutional policy and practice, not individual instances of disclosure." *Id.* at 288. The contrast between the language of Titles VI and IX and that of FERPA is stark. The specific, mandatory, individually focused language of Titles VI and IX confers individual rights, while the aggregate, programmatic focus of FERPA's language merely creates law applicable to the states. The distinction is dispositive: rights are enforceable under § 1983; laws are not. *Gonzaga Univ.*, 536 U.S. at 283 (citing *Blessing*, 520 U.S. at 340).

Despite the clarity of the statutory language, the Court went on to bolster its analysis by considering the structural elements of FERPA, which emphasize the programmatic and aggregate focus of the statute. Although references to the individual appear throughout the text of FERPA, "[i]n each provision the reference . . . is in the context of describing the type of 'policy or practice' that triggers a funding prohibition." *Id.* Indeed, the fact that Congress "expressly authorized the Secretary of Education to 'deal with violations' . . . and to 'establish or designate [a] review board'" buttressed the Court's assessment that

FERPA did not confer enforceable rights. *Id.* at 289 (citing 20 U.S.C. §§ 1232g(f)-(g)).[20] Finally, the Court highlighted statutory language reminiscent of that in *Blessing* that counseled against a finding of individual rights. *See id.* ("Recipient institutions can further avoid termination of funding so long as they 'comply substantially' . . . . This, too, is not unlike *Blessing*, which found that Title IV-D failed to support a § 1983 suit in part because it only required 'substantial compliance' with federal regulations.") (citing *Blessing*, 520 U.S. 329 at 335, 343).

## B.     Title XIX – Step Two

Having traced the Court's treatment of statutory rights under § 1983, we now turn to the "text and structure" of Title XIX. *Gonzaga Univ.*, 536 U.S. at 286.

### 1.     Statutory Text

"We begin with the familiar canon

---

[19]20 U.S.C. § 1232g(b)(1).

[20]Understandably, the Court did not reach the issue of whether the remedial scheme in FERPA was sufficient to preclude a § 1983 suit. *Gonzaga Univ.*, 536 U.S. at 590 n.8 ("We need not determine whether FERPA's procedures are 'sufficiently comprehensive' to offer an independent basis for precluding private enforcement due to our finding that FERPA creates no private right to enforce.") (citation omitted).

of statutory construction that the starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980).

Plaintiffs seek to enforce the right to acquire ICF/MR services, by virtue of 42 U.S.C. §§ 1396a(a)(10)[21] and 1396d(a)(15).[22] The language of the statute requires that a state "must provide . . . medical assistance . . . to . . . all [eligible] individuals," and includes intermediate care facilities in the definition of "medical assistance." 42 U.S.C. §§ 1396a(a)(10) & 1396d(a)(15). Plaintiffs also seek to enforce the right to acquire ICF/MR services with "reasonable promptness," as required by 42 U.S.C. § 1396a(a)(8).[23] The language of the statute declares that a state "must provide . . . assistance . . . with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8).

In each of these provisions, the statutory language is clear and unambiguous. Indeed, we can hardly imagine anyone disputing that a state must provide the assistance necessary to obtain ICF/MR services, and that it must

---

[21]For the relevant text of Section 1396a(a)(10), see note 5, *supra*.

[22]For the relevant text of Section 1396d(a)(15), see note 6, *supra*.

[23]For the relevant text of Section 1396a(a)(8), see note 4, *supra*.

do so with "reasonable promptness," and the government does not do so. Our inquiry, however, does not end there. Indisputably, these provisions create law, binding on those states choosing to accept Medicaid funding. Whether the same provisions confer rights, enforceable by individuals, is another question, and is the question we are called upon to answer.

To determine whether these provisions provide plaintiffs with unambiguously conferred rights, we begin with what has come to be called the "*Blessing* Test." *Blessing*, 520 U.S. at 340-41. As discussed above, the plain language of the statute clearly conveys that a state "must provide" plaintiffs with "medical assistance," including ICF/MR services, with "reasonable promptness." 42 U.S.C. §§ 1396a(a)(10), 1396d(a)(15), 1396a(a)(8). Without difficulty, we conclude that these provisions satisfy the *Blessing* Test because: (1) plaintiffs were the intended beneficiaries of §§ 1396a(a)(10), 1396d(a)(15), and 1396a(a)(8); (2) the rights sought to be enforced by them are specific and enumerated, not "vague and amorphous"; and (3) the obligation imposed on the states is unambiguous and binding. *Id.*

But, again, our inquiry does not end there because, as is explained in *Gonzaga University*, the *Blessing* Test may only indicate that plaintiffs "fall[] within the general zone of interest that the statute is intended to protect;

14

something less than what is required for a statute to create rights enforceable directly from the statute itself . . . ." *Gonzaga Univ.*, 536 U.S. at 283. To ensure that Congress unambiguously conferred the rights asserted, we must determine whether Congress used "rights-creating terms." *Id.* at 284.

The Court identified the text of Titles VI[24] and IX[25] as exemplars of rights-creating language. *Gonzaga Univ.*, 536 U.S. at 287. Viewing Titles VI and IX, we find it difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant Title XIX language–"A State plan must provide"–from the "No person shall" language of Titles VI and IX. Just as in Titles VI and IX, the relevant terms used in Title XIX are "mandatory rather than precatory." *Blessing*, 520 U.S. at 341. Further, the "individual focus" of Sections 1396a(a)(10), 1396d(a)(15), and 1396a(a)(8) is unmistakable. *Gonzaga Univ.*, 536 U.S. at 287. The relevant Title XIX provisions enumerate the entitlements available to "all eligible individuals." *See*, *e.g.,* 42 U.S.C. § 1396a(a)(8). The provisions do not focus on "the [entity] . . . regulated rather than the individuals protected." *Alexander v. Sandoval,* 532 U.S. at 289. Neither do

the statutory references to the individual appear "in the context of describing the type of 'policy or practice' that triggers a funding prohibition." *Gonzaga Univ.*, 536 U.S. at 288.

In requiring states which accept Medicaid funding to provide ICF/MR services with reasonable promptness, Congress conferred specific entitlements on individuals "in terms that 'could not be clearer.'" *Gonzaga Univ.*, 536 U.S. at 280 (quoting *Wright*, 479 U.S. at 430). There is no ambiguity. Where, as here, the plain meaning of the text is evident, we need not look further to determine congressional intent. *See, e.g., Darby v. Cisneros*, 509 U.S. 137, 147 (1993) ("Recourse to the legislative history . . . is unnecessary in light of the plain meaning of the statutory text.").[26]

---

[24]For the relevant text of Title VI, see note 15, *supra*.

[25]For the relevant text of Title IX, see note 16, *supra*.

[26]We note, however, that plaintiffs have cited legislative history that may be construed to support our reading of the statute. *See* App. Br. at 20-21 (citing various congressional legislative materials for the proposition that Title XIX authorizes individual suits under § 1983). *See, e.g.*, H.R. Rep. No. 104-651, at 213-14, 731-32, 2019-20 (1996); H.R. Rep. No. 104-350, at 211, 270, 288, 1069 (1995); and H.R. Rep. No. 97-158, vol. II, at 301 (1981). Because we find the statute unambiguous, however, we do not base our decision on legislative materials, or otherwise pass judgment on their relevance to our inquiry.

## 2. Statutory Structure

"As a general rule of statutory construction, where the terms of a statute are unambiguous, judicial inquiry is complete." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 642 (1990). "General" rules, however, are susceptible to exceptions, and we have before us one of those instances in which our inquiry does not end with the plain language of the statute. We recognize, of course, that "[s]tatutory construction 'is a holistic endeavor,' and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." *United States Nat'l Bank v. Independent Ins. Agents of Am.*, 508 U.S. 439, 455 (1993) (quoting *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988)). In *Gonzaga University*, the Court instructs that not only should the text of the statute be examined, but also its structure. *Gonzaga Univ.*, 536 U.S. at 286. This instruction makes good sense: we cannot presume to confer individual rights–that is a task for Congress. As the Court aptly put it, we "may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. at 291. Our judicial function is limited to recognizing those rights which Congress "unambiguously confers," and in doing so we would be remiss if we did not consider the whole of Congress's voice on the matter–the statute in its entirety.

Turning our sights beyond the narrow provisions invoked by plaintiffs gives us some pause. Indeed, the District Court, basing its decision largely on the structural elements of Title XIX, reached the opposite conclusion from that we reach. The District Court in large part grounded its analysis on 42 U.S.C. §§ 1396 and 1396c, and concluded that those provisions do not contain the rights-creating language required by *Gonzaga University*. *Sabree*, 245 F. Supp. 2d at 659. Undoubtedly, the Court was correct in that regard.

The opening section of Title XIX–Section 1396–is the appropriations and general introductory statement of the Medicaid Act.[27] As that Section

---

[27]Section 1396 provides:

> For the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability

(continued...)

16

explains, Title XIX was enacted "[f]or the purpose of enabling each State . . . to furnish . . . medical assistance." 42 U.S.C. § 1396. This language says nothing of individual entitlements or rights, but reminds us that we are dealing with an agreement between Congress and a particular state, and recalls the axiom of *Pennhurst*: "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst State Sch. & Hosp.,* 451 U.S. at 28.

Turning next, as did the District Court, to Section 1396(c) does not help in the search for rights-creating language. *Sabree*, 245 F. Supp. 2d at 660. Section 1396c empowers the Secretary of HHS to suspend payments to a state if it fails to "comply substantially" with the requirements of Title XIX.[28]

---

[27](...continued)
for independence or self-care, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this title. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance.

42 U.S.C. § 1396.

[28]Section 1396c provides:

If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this title, finds (1) that the plan has been so changed that it no longer complies with the provisions of section 1902; or (2) that in the administration of the plan there is a failure to *comply substantially* with any such provision; the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply. Until he is so satisfied he

(continued...)

**17**

This language not only confirms that Title XIX by its terms creates a relationship between Congress and a particular state, but it recalls, as well, the "comply substantially" language in *Blessing* and *Gonzaga University*. *Blessing*, 520 U.S. at 343; *Gonzaga Univ.*, 536 U.S. at 289. Of course, in *Blessing* and *Gonzaga University*, such language counseled against the recognition of an unambiguously conferred right.

But while the District Court correctly recognized that Sections 1396 and 1396c do not contain the "sort of explicit, rights-creating language found in Title VI," it did not consider the existence of rights-creating language in other relevant provisions of Title XIX. *Sabree*, 245 F. Supp. 2d at 659. The language used by Congress in 42 U.S.C. §§ 1396a(a)(10), 1396d(a)(15), and 1396a(a)(8), however, explicitly creates rights. Admittedly, plumbing for congressional intent by balancing the specific language of a few discrete provisions of Title XIX against the larger structural elements of the statute is a

difficult task. Nonetheless, it is evident, at least to us, that the statutory language, despite countervailing structural elements of the statute, unambiguously confers rights which plaintiffs can enforce.

We conclude that Section 1396, the appropriations and general introductory statement, cannot neutralize the rights-creating language of Sections 1396a(a)(10), 1396d(a)(15), and 1396a(a)(8). Our confidence in this conclusion rests securely on the fact that the Court has refrained from overruling *Wright* and *Wilder*, which upheld the exercise of individual rights under statutes that contain similar (or, in the case of *Wilder*, identical) provisions to 42 U.S.C. § 1396.

Section 1396 was in effect at the time of *Wilder*, in which the Court allowed claims to proceed under Title XIX, and a similar provision was in effect when the Court allowed claims to proceed in *Wright*. 42 U.S.C. §§ 1396 & 1437. But *Gonzaga University* did not overrule *Wilder*; rather, it explained that "Congress left no doubt of its intent for private enforcement." *Gonzaga Univ.*, 536 U.S. at 280-81 (quoting *Wilder*, 496 U.S. at 522-23). Neither did the Court overrule *Wright*; rather, it identified it as an instance in which Congress "unambiguously conferred 'a mandatory [benefit] focusing on the individual family and its income.'" *Gonzaga Univ.*, 536 U.S. at 280 (quoting *Wright*, 479 U.S. at 430).

<hr>

[28](...continued)
shall make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failure).

42 U.S.C. § 1396c (emphasis added).

We do not diminish the significance of the "comply substantially" language in Section 1396c. Rather, we recognize that the plaintiffs in *Blessing* sued under a provision requiring "substantial compliance" by a state. The Court held that the plaintiffs had no such right in the aggregate, *but specifically reserved decision on whether they might have individual rights under other provisions of the statute*, and remanded for a determination of that issue. *Blessing*, 520 U.S. at 345-46. This distinction makes good sense: that Congress provides a remedy for itself for non-compliance does not necessarily preclude a coherent and coexisting intent to create an enforceable right in individual beneficiaries. Significantly, and unlike the plaintiffs in *Blessing* and *Gonzaga*, plaintiffs here have advanced specific claims, rooted in discrete, rights-creating provisions of Title XIX.

## C.    Congressional Preclusion – Step Three

Even where a right has been unambiguously conferred, a state may rebut the presumption of the availability of § 1983 by demonstrating that Congress, either expressly or by providing a comprehensive remedial scheme, intended to preclude individual suits. *See, e.g., Blessing*, 520 U.S. at 346 ("Because petitioner does not claim that any provision of Title IV-D expressly curtails § 1983 actions, she must make the difficult showing that allowing § 1983 actions to go forward in these

circumstances 'would be inconsistent with Congress' carefully tailored scheme.'") (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)).

We note, however, that "[t]he burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant," and that a court should "not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy" for deprivation of an unambiguously conferred right. *Golden State Transit Corp.*, 493 U.S. at 107 (citations omitted). Indeed, only twice has the Court found a remedial scheme sufficiently comprehensive to supplant § 1983. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13, 14, 20 (1981) ("*Sea Clammers*") (acknowledging the "unusually elaborate enforcement provisions" empowering the E.P.A., coupled with several provisions allowing specific instances of private enforcement of the Federal Water Pollution Control Act, and concluding that Congress intended to preclude individual actions not explicitly allowed); *Smith v. Robinson*, 468 U.S. 992, 1009-11 (1984) (concluding that because the Education of the Handicapped Act permitted aggrieved individuals to invoke carefully tailored local administrative procedures followed by federal judicial review, Congress could not have intended individuals to bypass the enumerated procedure and advance directly to court via § 1983).

19

Title XIX contains no provision explicitly precluding individual actions. As a result, there is a substantial burden on a state seeking to establish that Congress has provided a comprehensive remedial scheme with which individual actions cannot be reconciled. Title XIX does allow for a state administrative hearing.[29] This is, however, the only remedial component of Title XIX, and clearly falls short of the comprehensive enforcement schemes seen in *Sea Clammers* and *Smith*. "[A] plaintiff's ability to invoke § 1983 cannot be defeated simply by 'the availability of administrative mechanisms to protect the plaintiff's interests.'" *Blessing*, 520 U.S. at 347 (quoting *Golden State Transit Corp.*, 493 U.S. at 106). *See also Wilder*, 496 U.S. at 523 ("The availability of state administrative procedures ordinarily does not foreclose resort to § 1983.").

### III. CONCLUSION

Plaintiffs have advanced specific claims rooted in statutory text that identify them as the intended recipients of medical assistance from the Commonwealth of Pennsylvania. That Congress may choose to sanction Pennsylvania for failure to comply with its own medical assistance plan does not necessarily preclude other repercussions, such as individual actions against the Commonwealth. Congress clearly and unambiguously conferred the rights of which plaintiffs have allegedly been deprived by Pennsylvania, and has not precluded individual enforcement of those rights. Accordingly, the order of the District Court will be reversed, and this case will be remanded for further proceedings in accordance with this Opinion.

---

[29]Section 1396a(a)(3) provides in relevant part: "A State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness . . . ." 42 U.S.C. § 1396a(a)(3).

20

Sabree v. Richman
No. 03-1226

ALITO, <u>Circuit Judge</u>, concurring:

While the analysis and decision of the District Court may reflect the direction that future Supreme Court cases in this area will take, currently binding precedent supports the decision of the Court. I therefore concur in the Court's decision.