**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 21, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MANDY R., by and through her
parents and guardians, Mr. and Mrs.
R.; LISA W., by and through her
parents and next friends, Mr. and Mrs.
W.; STEPHANIE F., by and through
her parents and next friends, Mr. and
Mrs. F.,

     Plaintiffs,

MARIAN L., by and through her
parent and guardian, Ms. L.; JODI F.,
by and through her parents and next
friends, Mr. and Mrs. F.; and CATHY
G., by and through her parent and
guardian, Russell G.,

     Plaintiffs-Intervenors,

  and

COLORADO ASSOCIATION OF
COMMUNITY CENTERED
BOARDS,

     Plaintiff-Intervenor - Appellant,

v.

BILL OWENS, Governor of the State
of Colorado; MARVA HAMMONS,
Executive Director of the Colorado
Department of Human Services;
KAREN REINERTSON, Executive
Director of the Colorado Department

No. 05-1148

of Health Care Policy and Financing; COLORADO DEPARTMENT OF HUMAN SERVICES; COLORADO DEPARTMENT OF HEALTH CARE POLICY AND FINANCING,

      Defendants - Appellees.

---

MANDY R., by and through her parents and guardians, Mr. and Mrs. R.; STEPHANIE F., by and through her parents and next friends, Mr. and Mrs. F.,

      Plaintiffs - Appellants,

JODI F., by and through her parents and next friends, Mr. and Mrs. F.; MARIAN L., by and through her parent and guardian, Ms. L.; CATHY G., by and through her parent and guardian, Russell G.,

      Plaintiffs-Intervenors - Appellants,

  and

LISA W., by and through her parents and next friends, Mr. and Mrs. W.,

      Plaintiff,

COLORADO ASSOCIATION OF COMMUNITY CENTERED BOARDS,

      Plaintiff-Intervenor,

No. 05-1150

v.

BILL OWENS, Governor of the State of Colorado; MARVA HAMMONS, Executive Director of the Colorado Department of Human Services; KAREN REINERTSON, Executive Director of the Colorado Department of Health Care Policy and Financing; COLORADO DEPARTMENT OF HUMAN SERVICES; COLORADO DEPARTMENT OF HEALTH CARE POLICY AND FINANCING,

Defendants - Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO (D.C. NO. 00-M-1609)**

---

R. Eric Solem, of Solem, Mack & Steinhoff, P.C., Englewood, Colorado for Appellants.

Richard Westfall, of Hale Friesen, LLP, Denver, Colorado, for Appellant Colorado Association of Community Centered Boards.

Wade S. Livingston, First Assistant Attorney General, Human Services Unit of the State Services Section, Denver, Colorado (Attorney General John W. Suthers with him on the brief), for Appellees.

---

Before **MURPHY**, **McCONNELL**, and **BALDOCK**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Colorado has a waiting list of hundreds of developmentally disabled persons who need but do not receive Medicaid-funded services. Six such persons and an association of providers brought this suit under 42 U.S.C. §1983, claiming that the State of Colorado has failed to comply with three requirements of the Medicaid Act, namely reasonable promptness, comparability, and sufficient payments. After a bench trial, the district court entered judgment for the Defendants. We hold that the reasonable promptness and comparability requirements do not require the State to provide services, and that neither recipients nor providers have a private right to enforce the sufficient payments requirement through §1983. We therefore **AFFIRM**.

## I. Factual and Procedural Background

This suit was brought in August 2000 by six persons, through their parents and guardians, against the governor of Colorado and two other state officials. The six individual plaintiffs are developmentally disabled persons who are on waiting lists for comprehensive residential services. These services are provided by public and private entities, which are paid by the State, which is in turn reimbursed for about half of the costs by the federal government through Medicaid. *See* 42 U.S.C. § 1396a. The State offers two kinds of Medicaid-funded services relevant to this suit. An Intermediate Care Facility for the Mentally Retarded (ICF/MR) is an institutional setting, usually large, and is "generally reserved for persons with extreme needs." Appellees' Answer Br. 5.

-4-

Three such facilities exist in Colorado, and they serve about 86 persons. Two of these facilities are managed by the State, and one is operated by a private organization. The State also provides Home and Community-Based Services (HCBS). In an HCBS setting, developmentally disabled persons live "in either a small host home (serving 1 to 3 people) or slightly larger group homes (serving 4 to 8 people)." *Id.* at 9. Over the last quarter-century the State has shifted its emphasis from ICFs/MR to HCBS, which are less expensive and less isolating.

Home and Community-Based Services are "waiver programs," which means that the State may offer them only after securing a waiver of certain Medicaid requirements from the federal government. They are also capped by the state's waiver application wherein a state must indicate the maximum number of participants it will accept in its waiver program. At the time of trial nearly 3,800 persons received HCB services. Another 733 persons wished to receive HCB services, but the services were unavailable. Roughly half of these 733 persons received no state services of any kind for the developmentally disabled. At the time of trial, only 21 persons were seeking ICF/MR services. The plaintiffs sought ICF/MR services, and each contended that the needed services were unavailable because the State refused to comply with federal law.

In October 2000, the Colorado Association of Community Centered Boards (CACCB) moved to intervene on the side of the plaintiffs. Community-centered boards are HCBS providers offering housing and medical care to the

developmentally disabled and receiving, in return, Medicaid payments from the state.

Suing under 42 U.S.C. §1983, the plaintiffs and intervenor alleged violations of the federal Medicaid Act, specifically that the State failed to provide the developmentally disabled with comprehensive residential services that meet the statutory requirements of reasonable promptness and comparability, which are described below. The individual plaintiffs sought a declaratory judgment and an injunction that would compel the state to meet the statute's requirements, but they did not and do not ask the courts to specify the way in which the State should comply with the statute. The individual plaintiffs sought class certification on behalf of all developmentally disabled persons in Colorado who remain on waiting lists to receive comprehensive medical services. Although opposing class certification, the CACCB generally supported the individual plaintiffs' claim. The CACCB also claimed that the State pays for Medicaid services for the developmentally disabled at rates that are too low to meet the statutory requirement of sufficient payments.

The district court denied class certification and, after a four-day trial, entered judgment for the Defendants. The plaintiffs now appeal.[1]

---

[1]One individual plaintiff began receiving the needed services shortly before trial. She does not appeal.

## II. Reasonable Promptness and Comparability

We begin with the claim that the State has failed to comply with the requirements of reasonable promptness and comparability. If a state chooses to participate in Medicaid, it must submit a state plan for providing "medical assistance." 42 U.S.C. § 1396a(a). The Medicaid Act imposes a number of conditions on a state plan, two of which are at issue in this case. The first is that medical assistance "shall be furnished with reasonable promptness to all eligible individuals." *Id.* § 1396a(a)(8). The second, the comparability requirement, is that the assistance any patient receives "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." *Id.* § 1396a(a)(10)(B)(i).

In addressing these claims, we assume that the individual plaintiffs may sue to enforce their rights under subsections (8) and (10). Since the Supreme Court clarified when a statute creates an enforceable private right in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), several circuit courts have considered whether one or both of these subsections creates an enforceable private right. Each has concluded that the provision in question does. *See, e.g.*, *Watson v. Weeks*, 436 F.3d 1152, 1159 & n.8 (9th Cir. 2006) (following the five federal circuit courts that have found a private right to sue for enforcement of § 1396a(a)(10), two of which did so after *Gonzaga*); *Sabree v. Richman*, 367 F.3d 180, 192 (3d Cir. 2004) (finding that each provision created an enforceable private right). *But see*

-7-

*Sanders ex rel. Rayl v. Kan. Dep't of Soc. and Rehab. Servs.*, 317 F. Supp. 2d 1233, 1250 (D. Kan. 2004) (concluding that subsection (8) does not create an enforceable private right but finding it "a closer question" than for some Medicaid provisions); *M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003) (concluding that subsection (8) does not create an enforceable private right). In this case, the district court did not clearly decide whether this portion of the statute creates a federal right enforceable under § 1983, but the parties have not disputed the point. We therefore assume without deciding that § 1983 gives the plaintiffs a right of action to enforce subsections (8) and (10). *See Burks v. Lasker*, 441 U.S. 471, 475-76 & n.5 (1979) ("The question whether a cause of action exists is not a question of jurisdiction, and therefore may be assumed without being decided.").

On the merits, the plaintiffs' reasonable promptness and comparability claims are two ways of characterizing one problem: that the individual plaintiffs are not receiving the comprehensive residential services they need. They are thus (1) not receiving them promptly and (2) not receiving them to the extent that others receive them. The outcome of both claims turns on the same question: What is the "medical assistance" that the State must provide promptly and equally?

The Medicaid Act defines "medical assistance" as "payment of part or all of the cost of the [described] care and services." 42 U.S.C. § 1396d(a). The

statutory definition mentions payment for, but not provision of, services. In other

words, "the statutory reference to 'assistance' appears to have reference to

*financial* assistance rather than to actual medical *services*." *Bruggeman ex rel.*

*Bruggeman v. Blagojevich*, 324 F.3d 906, 910 (7th Cir. 2003); *see also Westside*

*Mothers v. Olszewski*, 454 F.3d 532, 540 (6th Cir. 2006) (concluding that 42

U.S.C. §§ 1396a(a)(8) and (10) do not "require the State to provide medical

services directly" but rather require only financial assistance).[2] On its face, then,

the Medicaid Act requires any state participating in Medicaid to pay promptly and

evenhandedly for medical services when the state is presented with the bill. If

that is all the statute requires, then the plaintiffs have no claim: they are on a

waiting list for services, not a waiting list for payment for services.

The plaintiffs offer two reasons we should reject the natural reading of the

statute. The first is that the definition of "medical assistance," when read in

context, requires the State to provide actual services and not merely to pay for

them. The plaintiffs point to five contextual clues that "medical assistance"

---

[2]Some courts have suggested that there exists a circuit split on the question
of whether "medical assistance" requires a state to provide actual services.
*Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 181 n.1 (3d Cir. 2004); *Westside*
*Mothers*, 454 F.3d at 540. The existence of such a split is not entirely clear. Two
circuits have held that "medical assistance" requires only financial assistance.
*See Bruggeman*, 324 F.3d at 910; *Westside Mothers*, 454 F.3d at 540. Another
circuit has reserved the question. *Sabree,* 367 F.3d at 181. Without expressly
addressing the issue, two other circuits appear to have treated the statute as
requiring the provision of actual services. *Bryson v. Shumway*, 308 F.3d 79, 81,
88-89 (1st Cir. 2002); *Doe v. Chiles*, 136 F.3d 709, 714, 717 (11th Cir. 1998).

means actual services and not just financial payments. None of these clues, however, is sufficiently convincing to depart from the statutory definition of "medical assistance."

First, the plaintiffs point to another provision in the Medicaid Act, 42 U.S.C. § 1396a(a)(2), which requires the State to "assure that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope or quality of care and services available under the plan." But this requirement explicitly controls the method of "*financial* participation by the State." *Id.* (emphasis added). The State must ensure that the non-federal portion of an eligible patient's bill is paid, by picking up any slack from "local sources" of funding, but this provision says nothing about providing the services themselves.

Second, the plaintiffs suggest that the comparability provision requires the State to provide actual services because the "medical assistance" must be the same "in amount, duration, or scope." 42 U.S.C. § 1396a(a)(10)(B)(i). The words of this provision, however, can apply to the payment for services no less logically than to the provision of services. It is coherent, and consistent with the text of the comparability provision, to require states to pay for services on a comparable basis—in the same amounts, for the same duration, and in the same scope. Accordingly, this provision does not indicate which meaning we should give to "medical assistance," and it thus gives us no reason to depart from the general statutory definition for the Medicaid Act.

-10-

Third, the plaintiffs suggest that the State must provide services whenever necessary to assure that "care and services will be provided[] in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19). The plaintiffs give scant attention to this argument, and for good reason. In *Bruggeman* the Seventh Circuit held that this provision was "insufficiently definite to be justiciable, and in addition cannot be interpreted to create a private right of action." *Bruggeman*, 324 F.3d at 911 (citing three other circuits that have reached the same conclusion, under the Medicaid Act or under § 1983). We need not reach the private-right-of-action question, which is not before us, to determine that this provision does not require the State to provide actual services. If this provision implicitly required the State to provide services, because it is something in the "best interests of the recipients," we see no logical end. Without a logical stopping point or anything more definite than "best interests," we do not read this provision to require the State to provide actual services.

Fourth, the plaintiffs point to the plan the State filed with the federal government, which promised to provide ICFs/MR with "No Limitations." Colorado State Medicaid Plan, R. Vol. IV, at 755. This phrase appears in the state plan on a page titled "Amount, Duration and Scope of Medical and Remedial Care and Services Provided to the Categorically Needy." *Id.* A series of services are mentioned, from ICFs/MR to nurse-midwife services, and for each the

government checked boxes indicating that the services are provided with "No Limitations," are provided "With Limitations," or are "Not Provided." *Id*. As the director of the State's Medical Assistance Office explained, "limitations" are limits on payments to otherwise eligible patients, such as the limit that the State will pay for only 45 days of in-patient psychiatric services in a calendar year. R. Vol. II, at 350. If the State wishes to enforce such a limit on the provided services it will pay for, it must announce the limit in the state plan. By choosing "No Limitations," the State was abjuring limits such as the length of ICF/MR services for which it would pay, but there is no indication that by checking this box the State promised to build, staff, and maintain as many ICFs/MR as would be needed to meet the demand in Colorado.

Fifth, the plaintiffs assert that Colorado's waiver application indicates a commitment to ensuring that every eligible patient receives services, either from ICFs/MR or HCBS. The waiver application provides that a developmentally disabled adult deemed to require the level of care offered by an ICF/MR will be "informed of any feasible alternatives" to ICFs/MR and "[g]iven the choice of either institutional or home and community-based services." R. Vol. IV, at 863. Although the waiver application suggests that a developmentally disabled person will have a choice between an ICF/MR and HCBS, it does not assign to the State, or any other party, the responsibility to ensure that such facilities are in fact available. Indeed, the waiver application appears to mean only that the choice

-12-

among "feasible alternatives" is to be made by the recipient – not that the State must make alternatives available. Because it is at best ambiguous on the point, it provides no reason to reject the natural reading of the statutory definition. None of these five contextual clues, therefore, undermines the statutory definition of "medical assistance" as payment for services.

The plaintiffs' second reason to reject the payment-only reading of "medical assistance" is policy based. The plaintiffs accuse the State of promising to pay for services for the developmentally disabled and then suppressing the supply of these services. They are effectively asking us, in the alternative, (1) to conclude that in the context of the Medicaid Act, the state plan, and the State's waiver application, "medical assistance" includes a requirement that the State be a service-provider of the last resort; or (2) to graft onto "medical assistance" a good-faith requirement that would oblige the state not to discourage proposals from outside care providers. Such a good-faith requirement has intuitive appeal, for the State has obvious conflicts of interest. At oral argument the State even conceded that it may not escape paying for ICF/MR services by setting rates so low that no one can provide them. *Cf. Westside Mothers*, 454 F.3d at 541 (allowing plaintiffs, after amending their complaint, "to allege that inadequate payments effectively deny the right to 'medical assistance'").

Nevertheless, we need not decide whether a state has (or may assume) a good-faith obligation not to prevent new entrants into this market. The precise

-13-

claim brought by the plaintiffs is narrow. The plaintiffs do not suggest that ICF/MR rates have been set so low as to prohibit new entrants to the market. Nor do the plaintiffs claim that the State has discouraged efforts to build HCBS facilities, which is where the greatest shortfall in facilities exists. And the plaintiffs do not claim that the state has denied or effectively denied (through delay or similar means) a formal application to build new ICF/MR facilities. Indeed, the plaintiffs could not claim this, because no such applications have been filed. Instead, the individual plaintiffs claim that the State has discouraged efforts to build new ICFs/MR by responding cooly to initial inquiries. This is too nebulous a basis to support a legal claim. It is the State's prerogative to prefer HCBS over ICFs/MR – a preference shared by many advocates for the developmentally disabled – and to make that policy preference known. Assuming *arguendo* that the State has a duty (either statutory or self-imposed) not to prevent new entrants who could provide ICF/MR services, it violated no such duty here, where it neither rejected nor was even presented with any formal applications. If a case arises in which the State has effectively prevented a qualified provider of ICF/MR services from entering the market, we will have to decide whether such a good-faith requirement exists.

We therefore agree with the Sixth and Seventh Circuits that the Medicaid statute does not require states to be service-providers of last resort. *See Westside Mothers*, 454 F.3d at 540; *Bruggeman*, 324 F.3d at 910. Although *Bruggeman*

concerned a claim about the location of ICFs/MR within a state, and not about the

lack of them, the Seventh Circuit's conclusion is directly on point and persuasive:

> Medicaid is a payment scheme, not a scheme for state-provided
> medical assistance, as through state-owned hospitals. The regulations
> that implement the provision indicate that what is required is a
> prompt determination of eligibility and prompt provision of funds to
> eligible individuals to enable them to obtain the covered medical
> services that they need . . . ; a requirement of prompt *treatment*
> would amount to a direct regulation of medical services.

*Bruggeman*, 324 F.3d at 910.  The State must pay for medical services, but it need

not provide them.

### III. Rates

A second claim is brought only by the CACCB: that the State payments for

waiver services (HCBS) are insufficient to comply with the Medicaid Act.

Specifically, the CACCB claims that the rates at which the State pays for waiver

services violate 42 U.S.C. § 1396a(a)(30)(A), which requires a state to

> provide such methods and procedures relating to the utilization of,
> and the payment for, care and services available under the plan . . .
> as may be necessary to safeguard against unnecessary utilization of
> such care and services and to assure that payments are consistent
> with efficiency, economy, and quality of care and are sufficient to
> enlist enough providers so that care and services are available under
> the plan at least to the extent that such care and services are available
> to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A).  CACCB brings this claim not only for itself, as an

association of providers, but also on behalf of recipients generally (though not on

behalf of the six individual plaintiffs).  Before we can reach the merits of the

-15-

claim, we must decide whether subsection (30)(A) creates a private right enforceable under §1983. Section 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." To seek redress through §1983, a plaintiff must assert a violation of a federal right, not merely a violation of federal law. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). The Court has set forth three criteria necessary to finding that a statutory provision gives rise to a federal right:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Id.* at 340-41 (citations omitted). Once a plaintiff demonstrates that a statute creates a federal right, the right is presumptively enforceable under §1983 unless Congress specifically foreclosed such a remedy. *Gonzaga*, 536 U.S. at 284 & n.4.

In *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990) the Supreme Court considered a Medicaid provision with wording very similar to subsection (30)(A), and the Court did find an enforceable private right.[3] In *Gonzaga*, 536 U.S. at 283,

---

[3]The statute, which was known as the Boren Amendment and has since been repealed, was the previous version of 42 U.S.C. § 1902(a)(13). It read as follows:

a State plan for medical assistance must-

(continued...)

however, the Supreme Court tightened the first requirement. After *Gonzaga*, an enforceable private right exists only if the statute contains nothing "short of an unambiguously conferred right" and not merely a vague benefit or interest. *Id.* No enforceable right exists "where a statute by its terms grants no private rights to any identifiable class." *Id.* at 283-84. Although professing not to overrule *Wilder*, *Gonzaga* recharacterized the earlier decision as a case finding an enforceable private right in a "provision [that] required States to pay an 'objective' monetary entitlement to individual heath care providers." *See Gonzaga*, 536 U.S. at 280; *see also id.* at 300 n.8 (Stevens, J., dissenting).

---

[3](...continued)
. . . . .
provide . . . for payment . . . of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State . . .) *which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities* in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access . . . to inpatient hospital services of adequate quality.

42 U.S.C. § 1396a(a)(13)(A) (1982 ed., Supp. V), quoted in *Wilder*, 496 U.S. at 502-03 (emphasis in quotation).

Since *Gonzaga*, four circuit courts have considered whether subsection (30)(A) creates an enforceable private right. Three have concluded that the provision does not create an enforceable right. *Westside Mothers v. Olszewski*, 454 F.3d 532, 542-43 (6th Cir. 2006) (concluding that subsection (30)(A) "has an aggregate focus rather than an individual focus" and its "broad and nonspecific" language is "ill-suited to judicial remedy"); *Sanchez v. Johnson*, 416 F.3d 1051, 1059 (9th Cir. 2005) (finding no enforceable private right for recipients or providers because "nothing in the text of § 30(A) . . . unmistakably focuses on recipients or providers as individuals" and because "the flexible, administrative standards embodied in the statute do not reflect a Congressional intent to provide a private remedy for their violation"); *Long Term Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 57 (1st Cir. 2004) (finding no enforceable private right for providers because subsection (30)(A) "has no 'rights creating language' and identifies no discrete class of beneficiaries"). Only one circuit has found an enforceable private right. *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 443 F.3d 1005, 1015-16 (8th Cir. 2006) (following prior circuit precedent that subsection (30)(A) created an enforceable private right for recipients and providers, and concluding that even after *Gonzaga* the provision "creates enforceable rights for both groups").

We join the First, Sixth, and Ninth Circuits in concluding that subsection (30)(A) does not create a federal right enforceable under §1983. Even though

*Wilder* addressed a similar statute, our approach is controlled by *Gonzaga*, the Supreme Court's most recent assessment of private rights of action. Applying that analysis, we conclude that subsection (30)(A) "identifies no discrete class of beneficiaries." *Long Term Health Care Pharmacy Alliance*, 362 F.3d at 57. This provision refers to recipients only "in the aggregate, as members of 'the general population in the geographic area'"; and providers are mentioned only "as indirect beneficiaries 'enlisted' as subordinate partners in the administration of Medicaid services." *Westside Mothers*, 454 F.3d at 542-43 (quoting 42 U.S.C. § 1396a(a)(30)(A)). Recipients and providers surely benefit from efficient Medicaid administration, for example, as do taxpayers generally, but subsection (30)(A) never establishes an "identifiable class" of rights-holders. And without such an identifiable class, no enforceable federal right is created. *Gonzaga*, 536 U.S. at 283-84.

Because subsection (30)(A) fails to satisfy the first of the criteria set forth in *Blessing* for establishing a federal right enforceable under § 1983, there is no need for us to consider the other criteria. See *Gonzaga*, 536 U.S. at 287-89 (holding that certain provisions of federal law are not privately enforceable under § 1983 because there was no congressional intent to confer rights on individual beneficiaries, without consideration of other *Blessing* factors); *cf. id.* at 292 (Breyer, J., concurring) (agreeing with the majority but also concluding that "[m]uch of the statute's key language is broad and nonspecific").

-19-

One circuit has found that subsection (30)(A) creates an enforceable private right. Relying on its own precedent, *Wilder*, and *Gonzaga,* the Eighth Circuit found that both recipients and providers could sue to enforce this subsection. *Pediatric Specialty Care*, 443 F.3d at 1015-16. In analyzing *Gonzaga*, the court concluded that "[t]he beneficiaries [of subsection (30)(A)] are both the recipients of the services and the recipients of the state's payment," i.e., the providers. *Id.* at 1015. We respectfully disagree. Despite the fact that recipients and providers ultimately benefit from competent administration, they are nowhere identified in the statutory provision as a class of beneficiaries. And *Gonzaga* requires not a vague benefit or interest but rather an "unambiguously conferred right." 536 U.S. at 283. In sum, because the provision does not confer enforceable federal rights on identified beneficiaries, *Gonzaga* precludes interpreting subsection (30)(A) to create a federal right enforceable under §1983.

## IV. Class Certification

Finally, the plaintiffs also challenge the district court's denial of class certification. Because this opinion disposes of all issues in the potential class action, plaintiffs' motion for class certification is now moot. *See Gullickson v. Sw. Airlines Pilots' Ass'n*, 87 F.3d 1176, 1187 (10th Cir. 1996); *Rucker v. St. Louis Sw. Ry. Co.*, 917 F.2d 1233, 1237 n.1 (10th Cir. 1990).

## V. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's entry of judgment in favor of the defendants.