**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 9, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LEROY MORRIS; LEROY MORRIS, as
personal representative of the Estate of
Glenda Morris, deceased,

     Plaintiffs–Appellants,

v.

OKLAHOMA DEPARTMENT OF
HUMAN SERVICES, State of Oklahoma,
ex rel.; HOWARD H. HENDRICK,
Director of Oklahoma Department of
Human Services; OKLAHOMA
HEALTH CARE AUTHORITY, State of
Oklahoma, ex rel.; MIKE FOGARTY,
Director of Oklahoma Health Care
Authority,

     Defendants–Appellees.

------------------------------

OM FINANCIAL LIFE INSURANCE
COMPANY,

     Amicus Curiae.

No. 10-6241

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:09-CV-01357-C)**

Michael Craig Riffel (Katresa J. Riffel and Jessica L. Caruthers with him on the briefs), Mitchel, Gaston, Riffel & Riffle, PLLC, Enid, Oklahoma, for the Plaintiffs-Appellants.

Travis Smith (Lynn Rambo-Jones, Christopher J. Bergin, and Richard W. Freeman, Jr., with him on the briefs), Oklahoma Department of Human Services, Office of General Counsel, Oklahoma City, Oklahoma, for the Defendants-Appellees.

Stephen H. Kaufman and Eric J. Pelletier, Offit Kurman, P.A., Owings, Maryland, filed a brief for Amicus Curiae OM Financial Life Insurance Company, on behalf of Appellants.

Before **LUCERO**, **MATHESON**, and **FREUDENTHAL**,[*] Circuit Judges.

**LUCERO**, Circuit Judge.

The Medicare Catastrophic Coverage Act of 1988 ("MCCA") allows the spouse of an applicant for long-term care benefits to keep a certain amount of resources without affecting the applicant's eligibility. See 42 U.S.C. § 1396r-5(c)(2) & (f)(2). This Community Spouse Resource Allowance ("CSRA") permits an "institutionalized spouse" to obtain Medicaid assistance for nursing home or similar care without leaving his or her spouse, deemed by Medicaid the "community spouse," completely destitute. See § 1396r-5(h). A separate provision states that an annuity is not treated as an available

---

[*] The Honorable Nancy D. Freudenthal, Chief District Judge of the U.S. District Court for the District of Wyoming, sitting by designation.

resource for purposes of Medicaid eligibility if the annuity meets certain requirements.
See § 1396p(c)(1)(G). Additional provisions govern the transfer of resources between
spouses. See §§ 1396r-5(f)(1) & 1396p(c)(2)(B)(i). The question presented in this
appeal lies at the junction of these provisions.

Leroy and Glenda Morris brought suit under § 1983 and the Supremacy Clause to
challenge the Oklahoma Department of Human Services' ("OKDHS") denial of Mrs.
Morris' application for Medicaid benefits as inconsistent with federal law. After
calculating the couple's resources and the CSRA, OKDHS determined that the Morrises
were ineligible for benefits. In an effort to "spend down" their excess resources, the
Morrises purchased an actuarially sound annuity payable to Mr. Morris. Despite this
purchase, OKDHS determined that Mrs. Morris remained ineligible. It reasoned that
Mrs. Morris could not spend her share of the couple's resources on an annuity payable to
Mr. Morris, or in the alternative, that Mrs. Morris was subject to a transfer penalty for
transferring to Mr. Morris a sum in addition to the CSRA. The district court granted
summary judgment in favor of OKDHS, upholding the agency's application of the
Medicaid statutes.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further
proceedings. As the federal agency charged with administering Medicaid has noted, a
couple may convert joint resources—which may affect Medicaid eligibility—into income
for the community spouse—which does not impact eligibility—by purchasing certain
types of annuities. This result is not dependent on the CSRA provisions, which provide

an independent basis for sheltering certain resources. In other words, a couple may purchase a qualifying annuity payable to the community spouse in addition to the community spouse's retention of the CSRA. We further hold that § 1396r-5(f)(1)'s limit on spousal transfers applies only after a state agency has declared the institutionalized spouse eligible for Medicaid benefits. Although we understand the district court's concerns regarding the exploitation of what can only be described as a loophole in the Medicaid statutes, we conclude that the problem can only be addressed by Congress.

**I**

**A**

Medicaid is a program administered cooperatively by states and the federal government to provide "health care to persons who cannot afford such care." Brown v. Day, 555 F.3d 882, 885 (10th Cir. 2009). "Because spouses typically possess assets and income jointly and bear financial responsibility for each other, Medicaid eligibility determinations for married applicants have resisted simple solutions." Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 479 (2002). Prior to the MCCA, "each spouse was treated as a separate household." Johnson v. Guhl, 91 F. Supp. 2d 754, 761 (D.N.J. 2000). Jointly held resources to which a spouse had unrestricted access were considered available to that spouse for eligibility purposes, but assets solely held by the community spouse were treated as unavailable to the institutionalized spouse. Blumer, 534 U.S. at 479-80. This system produced "unintended consequences," as many "community spouses were left destitute by the drain on the couple's assets necessary to

-4-

qualify the institutionalized spouse for Medicaid," whereas "couples with ample means could qualify for assistance when their assets were held solely in the community spouse's name." Id. at 480.

By passing the MCCA, Congress intended to "protect community spouses from 'pauperization' while preventing financially secure couples from obtaining Medicaid assistance." H.R. Rep. No. 100-105, pt. 2, at 65 (1987). The current version of the statute no longer looks to the nominal ownership of resources or to "any State laws relating to community property or the division of marital property." § 1396r-5(b)(2). Instead, after subtracting the CSRA, Medicaid administrators must count all remaining "resources held by either the institutionalized spouse, community spouse, or both" as "available to the institutionalized spouse." § 1396r-5(c)(2)(A).

The MCCA also addresses the transfer of resources between spouses. Although the statute generally disallows transfers for less than fair market value up to two years prior to a Medicaid application, it exempts spousal transfers from this prohibition. § 1396p(c)(2)(B)(i). This provision appears to allow for unlimited transfers between spouses. However, a separate provision, § 1396r-5(f)(1), sets a cap on the amount that a spouse can transfer "after the date of the initial determination of eligibility." The latter states:

> An institutionalized spouse may, without regard to [§ 1396p(c)(1)], transfer an amount equal to the [CSRA], but only to the extent the resources of the institutionalized spouse are transferred to (or for the sole benefit of) the community spouse. The transfer under the preceding sentence shall be made as soon as practicable after the date of the initial determination of

-5-

eligibility . . . .

§ 1396r-5(f)(1).

**B**

For a married long-term care applicant, the process of receiving Medicaid coverage generally begins with a request for assessment. At the beginning of the first continuous period of institutionalization[1] of the institutionalized spouse, the couple may request that the state assess the "total value of the resources to the extent either the institutionalized spouse or the community spouse has an ownership interest," and a "spousal share," equal to half of that amount. § 1396r-5(c)(1)(A) & (B). For many couples the "spousal share" will be used to establish the CSRA—the amount of resources the community spouse may keep without affecting the institutionalized spouse's eligibility. See § 1396r-5(f)(2)(A)(ii) & (c)(2)(B). This resource assessment can, but need not, occur as "part of an application for medical assistance." § 1396r-5(c)(1)(B).

The next subsection of this statute discusses resource allocation at the "time of application for benefits." § 1396r-5(c)(2). This subsection is entitled "Attribution of

---

[1] Long-term care is usually provided in a nursing home or other assisted-living facility. See § 1396d(a)(4)(A). However, "[a]s an alternative to institutionalization, Congress provides for home and community-based services as part of an optional waiver program." Fisher v. Okla. Health Care Auth., 335 F.3d 1175, 1178 (10th Cir. 2003). If a state elects to take part in such a program, the federal government waives certain statutory requirements and the state "allows individuals who meet the level of care required for institutionalization in a nursing facility to live at home and receive state-funded medical care." Id. "Oklahoma obtained such a waiver from the federal government for its Advantage Program." Id. (citing Okla. Admin. Code. § 317:30-5-760).

resources at time of <u>initial eligibility determination</u>." <u>Id.</u> (emphasis added).  At this point,

"all the resources held by either the institutionalized spouse, community spouse, or both,

shall be considered to be available to the institutionalized spouse," but "only to the

extent" that amount exceeds the CSRA.  <u>Id.</u>

Finally, § 1396r-5(c)(4), titled "Separate treatment of resources after eligibility for

benefits established," provides that "after the month in which an institutionalized spouse

is determined to be eligible for benefits . . . , no resources of the community spouse shall

be deemed available to the institutionalized spouse."  <u>Id.</u>

**C**

Importantly, the provisions set forth above refer only to resources.  Although all of

a couple's countable resources—except the CSRA—are treated as available to the

institutionalized spouse at the time of the application for benefits, <u>see</u> § 1396r-5(c)(2), a

community spouse's income has no effect on an institutionalized spouse's eligibility.

§ 1396r-5(b)(1) ("[N]o income of the community spouse shall be deemed available to the

institutionalized spouse.").

The manner in which Medicaid treats annuities makes this asymmetry highly

relevant.  An annuity that is, inter alia, irrevocable, non-assignable, and actuarially sound,

<u>see</u> § 1396p(c)(1)(G), is generally not treated as a resource:

> If the individual has the right, authority or power to liquidate the
> property or his or her share of the property, it is considered a
> resource.  If a property right cannot be liquidated, the property will
> not be considered a resource of the individual (or spouse).

-7-

20 C.F.R. § 416.1201.  In other words, the purchase of certain annuities may allow the

conversion of disqualifying resources into exempt income.

The State Medicaid Manual acknowledges this issue and attempts to distinguish

between annuities "validly purchased as part of a retirement plan [and] those which

abusively shelter assets."  Health Care Fin. Admin., U.S. Dep't of Health & Human

Servs., State Medicaid Manual 64 § 3258.11 (1994).[2]  This section of the manual is

commonly referred to as "Transmittal 64."  It continues:

> The exceptions to the transfer of assets penalties regarding
> interspousal transfers and transfers to a third party for the sole
> benefit of a spouse apply even under the spousal impoverishment
> provisions.  Thus, the institutional spouse can transfer unlimited
> assets to the community spouse or to a third party for the sole benefit
> of the community spouse.
>
> When transfers between spouses are involved, the unlimited transfer
> exception should have little effect on the eligibility determination,
> primarily because resources belonging to both spouses are combined
> in determining eligibility for the institutionalized spouse.  Thus,
> resources transferred to a community spouse are still [to] be
> considered available to the institutionalized spouse for eligibility
> purposes.
>
> The exception for transfers to a third party for the sole benefit of the
> spouse may have greater impact on eligibility because resources may
> potentially be placed beyond the reach of either spouse and thus not
> be counted for eligibility purposes.  However, for the exception to be
> applicable, the definition of what is for the sole benefit of the spouse
> (see §3257) must be fully met.  This definition is fairly restrictive, in
> that it requires that any funds transferred be spent for the benefit of

---

[2] In 2001, the Health Care Financing Administration became the Center for
Medicare and Medicaid Services.  See Statement of Organization, 66 Fed. Reg. 35437-03
(July 5, 2001).

the spouse within a time-frame actuarially commensurate with the spouse[']s life expectancy. If this requirement is not met, the exemption is void, and a transfer to a third party may then be subject to a transfer penalty.

Id. (emphasis added). Although the State Medicaid Manual "does not have the force and effect of law," we defer to its provisions "to the extent that they are consistent with the purposes of the federal statute and provide a reasonable interpretation thereof." Hobbs ex rel. Hobbs v. Zenderman, 579 F.3d 1171, 1186 n.10 (10th Cir. 2009) (citation and quotation omitted).

## II

On March 26, 2008, the Morrises sent a "Request for Assessment" form to OKDHS requesting that their resources and income be assessed for eligibility in the Medicaid Advantage Waiver Program. The Morrises' countable resources totaled $107,812. Dividing that figure in half, OKDHS treated $53,906 as Mr. Morris' CSRA, and attributed the same amount to Mrs. Morris. Because the resource eligibility limit for the Advantage Program was $2,000, Mrs. Morris did not qualify for Medicaid assistance at that time; the couple would need to "spend down" $51,906 to become eligible.

On April 1, 2008, the Morrises paid a law firm $4,000 and purchased two prepaid burial contracts for $7,500 each. The Morrises also purchased an annuity for $41,000 that would pay Mr. Morris $1,140.47 per month for three years. Mr. Morris sent the annuity application along with payment on April 1, 2008, signed the annuity application on April 8, and the annuity was issued on April 10. It was subject to a ten-day

cancellation period.

According to OKDHS, Mrs. Morris again applied for Medicaid benefits under the Advantage Program on April 3, 2008. OKDHS characterizes this as her "second Medicaid application." The agency issued a notice denying benefits on April 7, 2008, concluding that Mrs. Morris had more than $2,000 in countable resources. On April 8, the agency received a letter from the Morris' counsel informing the agency that the Morrises had spent down their resources and requesting benefits under the Advantage Program. When the Morrises received notice of the denial, they requested a "fair hearing." In July 2009, OKDHS conceded that the annuity the Morrises had purchased was actuarially sound, resulted in a fair market value return, and that the income stream could not be resold.[3] Following these concessions, the Morrises and OKDHS agreed to submit the agency's decision to an administrative hearing officer for review.

On July 29, 2009, the OKDHS Appeals Committee issued a decision affirming the agency's conclusion that Mrs. Morris was ineligible for benefits because her countable resources exceeded $2,000. OKDHS Director Howard Hendrick affirmed this decision. He provided two reasons for this determination.

First, he reasoned that "42 U.S.C. § 1396r-5 required that half of the [Morrises'] resources be attributed to each spouse. Half of $107,812 is $53,906 – which became Mr.

---

[3] We note that thirty-six payments of $1,140.47 total $41,056.92, and thus the annuity would pay just $56.92 above the initial investment over the course of three years. Given the agency's conclusion, however, these issues are not before us.

Morris' CSRA." Because "[a]ll of the couple's resources in excess of Mr. Morris' $53,906 CSRA must count toward Mrs. Morris' $2,000 resource limit," Hendrick held that she continued to exceed the resource cutoff. "That Mrs. Morris decided to use $41,000 of her resources to buy an annuity for Mr. Morris is of no consequence in determining her [Advantage] eligibility and did not count as a spend[ ]down of her resources."

Second, Hendrick concluded in the alternative that the annuity purchase was a disqualifying transfer of resources. Under this theory, Hendrick stated that "Mrs. Morris made a transfer to Mr. Morris without receiving FMV [fair market value] in return when he used $41,000 of her resources to buy the annuity – from which only Mr. Morris benefitted." The MCCA permits inter-spousal transfer of resources, Hendrick determined, only "in an amount necessary to bring the community spouse's resources up to the CSRA." See 42 U.S.C. § 1396r-5(c)(1). Because Mrs. Morris transferred an additional $41,000 to Mr. Morris, Hendrick imposed a 309-day disqualification period using a Medicaid formula for penalizing improper transfers.

Following their exhaustion of administrative remedies, the Morrises filed suit in federal district court under § 1983 and the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2.[4] On competing motions for summary judgment,

_____

[4] Defendants do not argue that the Morrises lack a cause of action to pursue this type of claim, and thus we have no occasion to opine on the issue. See Mandy R. ex rel. Mr. & Mrs. Mandy R. v. Owens, 464 F.3d 1139, 1143 (10th Cir. 2006) (because the issue

Continued . . .

-11-

the district court ruled in favor of OKDHS. It concluded that § 1396r-5 "prohibits the community spouse from purchasing, after an initial determination of eligibility, an annuity above that spouse's [CSRA]." The Morrises now appeal.

## III

We review the grant of summary judgment de novo. Hobbs, 579 F.3d at 1179. Summary judgment should be granted only if, viewing the evidence in the light most favorable to the non-moving party, the movant is entitled to judgment as a matter of law. Id.

## A

As noted above, OKDHS provided two reasons for rejecting Mrs. Morris' application. First, the agency held the fact "[t]hat Mrs. Morris decided to use $41,000 of her resources to buy an annuity for Mr. Morris is of no consequence in determining her [Advantage] eligibility and did not count as a spend[ ]down of her resources." The agency's precise reasoning on this point is somewhat opaque. OKDHS did not cite any provision of the Medicaid statute for its conclusion, and the parties have provided no basis upon which to conclude the purchase of an annuity would be anything other than a spend down. As best we can tell, OKDHS determined that an annuity payable to Mr. Morris should be counted toward Mrs. Morris' resources for the purpose of determining eligibility. We conclude that this rationale is not consistent with the Medicaid statutes.

is not jurisdictional, we will assume without deciding that a cause of action exists when defendants fail to dispute it).

-12-

For Medicaid purposes, an annuity generally counts as an "asset."  See

§ 1396p(c)(1)(G).  Under § 1396p(h)(1), "assets" include both income and resources.

However, an annuity that satisfies various conditions does not qualify as a resource.  See

§ 1396p(c)(1)(G).  As the Medicaid regulations explain, "[i]f a property right cannot be

liquidated, the property will not be considered a resource of the individual (or spouse)."

20 C.F.R. § 416.1201.  And OKDHS explicitly agreed in its final decision that Mr.

Morris' annuity "met the requirements found in 42 U.S.C. § 1396p(c)(1)(F) and (G)."

OKDHS should therefore have considered the annuity as Mr. Morris' income.  And such

income would not affect Mrs. Morris' eligibility because "no income of the community

spouse shall be deemed available to the institutionalized spouse."[5]  § 1396r-5(b)(1).

The weight of authority supports this interpretation.  See Hutcherson v. Ariz.

Health Care Cost Containment Sys. Admin., 667 F.3d 1066, 1069 (9th Cir. 2012) (noting

that the annuity provision "allow[s] the spouse to convert his or her assets, which are

considered in determining the institutionalized spouse's eligibility, to income which is

not considered");  James v. Richman, 465 F. Supp. 2d 395, 403 (M.D. Pa. 2006) (holding

"available assets may become unavailable assets and not countable in determining

---

[5] At least one court has held that the resale value of the income stream generated by an annuity may be treated as a resource.  See N.M. v. Div. of Med. Assistance & Health Servs., 964 A.2d 822, 829 (N.J. Super. Ct. App. Div. 2009).  However, OKDHS found that "Mrs. Morris had rebutted the presumption found in [Okla. Admin. Code § 317-35-5-41.7(1)(B)] that the annuity or the income stream could be sold." Accordingly, we do not weigh in on the issue of whether a state may treat the potential resale value of an annuity as a resource.

Medicaid eligibility for the institutionalized spouse when an irrevocable actuarially sound commercial annuity is purchased for the sole benefit of the community spouse"); Mertz v. Houston, 155 F. Supp. 2d 415 (E.D. Pa. 2001) ("[A] couple may effectively convert countable resources into income of the community spouse which is not countable in determining Medicaid eligibility for the institutionalized spouse by purchasing an irrevocable actuarially sound commercial annuity for the sole benefit of the community spouse."); Vieth v. Ohio Dep't of Job & Family Servs., 2009 Ohio 3748, at P34 (Ohio Ct. App. 2009) (concluding that "funds used to purchase an actuarially sound, non-revocable, non-transferable commercial annuity, for the sole benefit of the community spouse, are not countable resources for Medicaid eligibility purposes"); see also Dean v. Del. Dep't of Health & Social Servs., 2000 Del. Super. LEXIS 490, at *31, No. 00A-05-006 (Super. Ct. Del. Dec. 6, 2000) (unpublished), aff'd 781 A.2d 693 (Del. 2001) (holding that the purchase of an annuity produces uncountable community-spouse income); Estate of F.K. v. Div. of Med. Assistance & Health Servs., 863 A.2d 1065, 146 (N.J. Super. Ct. App. Div. 2005) (relying on Transmittal 64 to strike down a New Jersey regulation that capped the amount a couple could spend on an annuity at the couple's CSRA).

This is also the reading of the statute adopted by the agency charged with administering the Medicaid program. See Via Christi Reg'l Med. Ctr., Inc. v. Leavitt, 509 F.3d 1259, 1261& n.1 (10th Cir. 2007) (Centers for Medicare and Medicaid Services, formerly the Health Care Financing Administration, administers Medicaid program). As

-14-

that agency forthrightly acknowledged in Transmittal 64, "[t]he exception for transfers to a third party for the sole benefit of the spouse may have greater impact on eligibility because resources may potentially be placed beyond the reach of either spouse and thus not be counted for eligibility purposes." State Medicaid Manual § 3258.11.

Finally, despite its presumed awareness of these judicial and administrative interpretations, see Lorillard v. Pons, 434 U.S. 575, 580 (1978) (administrative); Dobbs v. Anthem Blue Cross & Blue Shield, 600 F.3d 1275, 1282 (10th Cir. 2010) (judicial), Congress has not revised the Medicaid statute to foreclose this option. Indeed, rather than close the annuity "loophole," Congress has twice amended the Medicaid statutes to specify the types of annuities capable of producing uncountable spousal income. See Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922, 2998; Deficit Reduction Act of 2005, Pub. L. 109–171, 120 Stat. 4, 62-64.

Stated simply, nothing in the Medicaid statutes support OKDHS' apparently categorical decision that the purchase of an annuity does not count as a spend down. Although an annuity may continue to qualify as a resource depending on its specific characteristics, OKDHS explicitly stated that the annuity at issue satisfied § 1396p(c)(1)(G). Accordingly, we must reject the agency's first rationale for denying Medicaid coverage to Mrs. Morris.

**B**

OKDHS' second justification for its decision presents a closer question. The agency held in the alternative that the Morrises violated the transfer provisions of the

-15-

MCCA when they purchased the annuity, and thus were subject to a disqualification penalty. OKDHS based this conclusion on its determination that Mrs. Morris was permitted to transfer resources to Mr. Morris only in the amount necessary to bring his resources up to the CSRA. Accordingly, our review of this holding requires us to analyze the manner that § 1396p(c)(2)(B), which apparently allows for unlimited transfers between spouses, interacts with § 1396r-5(f)(1), which allows the transfer of "an amount equal to the community spouse resource allowance . . . as soon as practicable <u>after the date of the initial determination of eligibility</u> . . . ." (emphasis added).

**1**

Although a majority of courts have permitted annuity purchases, none of the decisions cited in Part III.A, <u>supra</u>, specifically address the impact of § 1396r-5(f)(1) on such purchases. The district court cited <u>Burkholder v. Lumpkin</u>, 2010 U.S. Dist. LEXIS 11308, No. 3:09CV01978 (N.D. Ohio Feb. 9, 2010) (unpublished), which considered the interplay between § 1396r-5(f)(1) and § 1396p(c)(2)(b)(i) in a different context. <u>Burkholder</u> did not concern annuities but whether an individual receiving nursing home care through Medicaid was subject to a penalty when, after receiving an inheritance, he immediately transferred the inherited assets to his community spouse. <u>See</u> <u>Burkholder</u>, 2010 U.S. Dist. LEXIS 11308, at *1.

As the <u>Burkholder</u> order notes, the two provisions at issue are "amenable to two distinct interpretations." <u>Id.</u> at *12-13. Section 1396r-5(f)(1), the apparently unlimited transfer provision,

-16-

may provide an <u>additional</u>, or <u>separate</u>, basis for transfer besides that of § 1396p(c)(2)(B)(i). Under such a reading, an institutionalized spouse may transfer assets up to the CSRA limit for less than fair market value on or after the look-back date under § 1396r-5(f)(1), but he or she may also do so, without limitation as to amount, under § 1396p(c)(2)(B)(i) so long as the assets are for the sole benefit of the community spouse.

<u>Burkholder</u>, 2010 U.S. Dist. LEXIS 11308, at *13. However, § 1396r-5 states that "[i]n determining the eligibility for medical assistance of an institutionalized spouse . . . the provisions of this section supersede any other provision of this title . . . which is inconsistent with them." § 1396r-5(a)(1). Thus, alternatively, § 1396r-5(f)(1), "may <u>supersede</u> and <u>limit</u> § 1396p(c)(2)(B)(i)'s transfer provision. Under such a reading, an institutionalized spouse may only transfer assets up to the CSRA limit for less than fair market value on or after the look-back date under § 1396r-5(f)(1). Section 1396p(c)(2)(B)(i) thus would not allow additional transfers." <u>Burkholder</u>, 2010 U.S. Dist. LEXIS 11308, at *13.

The district court in <u>Burkholder</u> settled on the latter interpretation, concluding that the former construction "would render § 1396r-5's CSRA limit superfluous." 2010 U.S. Dist. LEXIS 11308, at * 13. It held that Transmittal 64 did not apply because it discusses only "transferrals occurring prior to the initial eligibility determination," which were not at issue in the case at bar. <u>Id.</u> at *22 n.12 (emphasis omitted). Finally, the court concluded that "§ 1396r-5(f) supersedes § 1396p(c)(2) where . . . the transfer of assets from the institutionalized spouse to the community spouse occurs after the initial eligibility determination." <u>Burkholder</u>, 2010 U.S. Dist. LEXIS 11308, at *25. Thus,

-17-

Ohio properly discontinued the plaintiff's Medicaid-paid care after he transferred his inheritance to his spouse.

In granting summary judgment to OKDHS, the district court extended the reasoning of Burkholder a step further. Although the court did not use § 1369r-5(f) as basis for limiting transfers above the CSRA, it determined that "the CSRA was intended to be a ceiling on the community spouse's resources during and after the eligibility determination." Morris v. Okla. Dept. of Human Services, 758 F. Supp. 2d 1212, 1219 (W.D. Okla. 2010) (emphasis added). The district court thus held that the limited transfer provision of § 1396r-5(f) applies prior to a determination that an applicant is eligible for Medicaid benefits. Seeking to defend this conclusion, OKDHS argues on appeal that the phrase "date of the initial determination of eligibility" used in § 1396r-5(f) refers to the date when an individual is initially determined to be either eligible or ineligible for Medicaid.

We reject this approach. To avoid rendering § 1396p(c)(2)(B)(i) superfluous, we agree that it and § 1396r-5(f)(1) must be read to operate at distinct temporal periods: one period during which unlimited spousal transfers are permitted, and one period during which transfers may not exceed the CSRA. However, the text of § 1396r-5(f)(1), considered in isolation, leaves unanswered the critical interpretive question in this appeal: at what point in the process does § 1396r-5(f)(1)'s restriction on spousal transfers begin? Looking to the statute as a whole, we hold that § 1396r-5(f)(1)'s limitation on transfers to the community spouse applies only after an individual has been found to be eligible for

-18-

Medicaid assistance.

**2**

Section 1396r-5(f)(1), which allows for the transfer of "an amount equal to the [CSRA]," requires that the transfer "shall be made as soon as practicable <u>after the date of the initial determination of eligibility</u>." <u>Id.</u> (emphasis added). The MCCA does not define "initial determination of eligibility," and recourse to the ordinary meaning of these terms fails to resolve the issue. In common usage, a "determination" can be the "act of deciding" or it can be "the result of such an act of decision." <u>Webster's New Collegiate Dictionary</u> 346 (9th ed. 1991). We therefore conclude that the phrase "determination of eligibility" could reasonably be construed as referring to a determination <u>whether</u> an individual is eligible (or ineligible) or a determination <u>that</u> an individual is eligible. To resolve this ambiguity, we look to "the broader context of the statute as a whole." <u>Conrad v. Phone Directories Co.</u>, 585 F.3d 1376, 1381 (10th Cir. 2009) (quotation omitted).

Congress did not use the precise phrase "initial determination of eligibility" elsewhere in the Medicaid statutes, but it employed a similar formulation in two other instances. <u>See</u> § 1396a(e)(13)(A)(ii) ("initial determinations of eligibility"); § 1396r-5(c)(2) ("initial eligibility determination"). The former does not aid in our interpretation. The latter provides:

> Attribution of resources at time of initial eligibility determination.

In determining the resources of an institutionalized spouse at the time of application for benefits under this subchapter, regardless of any State laws relating to community property or the division of marital property –

(A) except as provided in subparagraph (B), all the resources held by either the institutionalized spouse, community spouse, or both, shall be considered to be available to the institutionalized spouse, and

(B) resources shall be considered to be available to an institutionalized spouse, but only to the extent that the amount of such resources exceeds the amount computed under subsection (f)(2)(A) of this section (as of the time of application for benefits).

§ 1396r-5(c)(2).

Section headings "cannot substitute for the operative text of the statute," but may be used as "tools available for the resolution of a doubt about the meaning of a statute." Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 47 (2008) (quotation omitted). Subsection 1396r-5(c)(2)'s heading provides some support for OKDHS' position. Congress used a phrase in that heading similar to § 1396r-5(f)(1)'s formulation to refer to the period during which a state agency decides whether an applicant is eligible for Medicaid. Nevertheless, to resolve the determinative question in this appeal, we must consider § 1396r-5(f)(1) by reference to the manner in which Medicaid's broader resource allocation system operates.

To transfer a resource is to "change over the possession or control of" that resource. Black's Law Dictionary (6th ed. 1990). Recall, however, that the MCCA renders nominal title or control between spouses irrelevant. Following passage of the MCCA, agencies must ignore "State laws relating to community property or the division

-20-

of marital property," § 1396r-5(b)(2), and instead treat resources in excess of the CSRA "held by either the institutionalized spouse, community spouse, or both" as "available to the institutionalized spouse," § 1396r-5(c)(2)(A). Congress, moreover, appears to have drafted the transfer provision found in § 1396p(c)(2)(B)(i) with precisely this allocation program in mind. Given that Medicaid administrators must consider all of a couple's resources—irrespective of nominal ownership—"no purpose would be served by prohibiting transfers of countable resources from the institutionalized spouse to the community spouse." H.R. Rep. 100-105, at 73 (1988). Transmittal 64 reflects this same judgment explaining that "[w]hen transfers between spouses are involved, the unlimited transfer exception should have little effect on the eligibility determination . . . [because] resources transferred to a community spouse are still . . . considered available to the institutionalized spouse for eligibility purposes." State Medicaid Manual § 3258.11.

Not so once an agency affirmatively determines that an institutionalized spouse is eligible for benefits, at which point "separate treatment of resources" begins. § 1396r-5(c)(4). "[A]fter the month in which an institutionalized spouse is determined to be eligible for benefits . . . no resource of the community spouse shall be deemed available to the institutionalized spouse." Id. Following a determination that one spouse is eligible, the couple appears to have some period of time to transfer any excess resources held in the institutionalized spouse's name into the community spouse's name. Section 1396r-5(f)(1) facilitates this transition by providing that, "[a]s soon as practicable after the date of the initial determination of eligibility" the couple may transfer title to

resources so that the community spouse holds the full amount of the CSRA in her name. But if the institutionalized spouse attempts to transfer newly received resources, such as occurred in <u>Burkholder</u>, he will face a penalty.

The fact that resource allocation rules differ significantly depending on whether an applicant has been "determined to be eligible for benefits," § 1396r-5(c)(4), strongly supports the Morrises' contention that § 1396r-5(f)(1) refers to the date an individual is deemed eligible rather than the date on which an individual is deemed either eligible or ineligible. It makes perfect sense that Congress would allow for unlimited resource transfers between spouses during the period that such transfers would not impact Medicaid eligibility, but cap inter-spousal transfers during the period when nominal ownership matters. By giving the same meaning to the phrases "initial determination of eligibility," § 1396r-5(f)(1), and "determined to be eligible," § 1396r-5(c)(4), we can give coherent effect to both provisions.

In contrast, we see no reason why a determination of ineligibility would justify different transfer rules. When an agency concludes that an individual is ineligible, this decision does not trigger the ownership-based treatment of resources. The couple merely learns they must spend down further in order to become eligible, and all resources— irrespective of which partner holds title—continue to affect the institutionalized spouse's eligibility for Medicaid. Thus, an agency's denial of Medicaid benefits is not a watershed moment; a determination that an individual is eligible, however, results in a dramatic change.

OKDHS' argument to the contrary misunderstands the effect of the CSRA calculation. The CSRA allotment is a planning tool based on a couples' combined resources at the time of the application for benefits, see § 1396r-5(c)(2)(B). It is not an actual division of resources; nominal resource ownership is simply not relevant in determining the resources available to the applicant. See State Medicaid Manual § 3258.11.

We recognize that couples like the Morrises may act strategically by converting resources to income after establishing their CSRA in order to qualify for a higher allowance than if they purchased an annuity prior to the CSRA calculation. We note, however, that an agency's determination of whether an applicant is eligible is not the first or only time when a couple's CSRA may be calculated. The statute clearly contemplates that a couple may request that an agency assess the community "spousal" share prior to and apart from an application for benefits. § 1396r-5(c)(1)(A) & (B). If Congress sought to limit spousal transfers following the CSRA calculation, it would make little sense to focus on eligibility determinations but not on resource assessments.

The imposition of a transfer penalty for an alleged transfer of $41,000 from Mrs. Morris to Mr. Morris was thus not consistent with the federal statute. The transfer, to the extent it occurred at all, occurred prior to a determination that Mrs. Morris was eligible for Medicaid. This is so because Mrs. Morris was never determined to be eligible. In this context, the unlimited transfer provision of § 1396p(c)(2) controls, and the transfer penalty was improper.

-23-

OKDHS argues in the alternative that Mr. Morris used a portion of his CSRA to purchase the annuity, leaving Mrs. Morris with excess resources. As the district court concluded, this interpretation of the facts "would leave Mrs. Morris yet to spend down her spousal share [and] would leave Mrs. Morris with excess resources." However, this reasoning rests on the same fundamental misapprehension of the Medicaid statutes discussed above.

Prior to a determination of eligibility, there is no reason to apportion a couple's resources in the manner urged by OKDHS. Although the Medicaid statute does allow a request for assessment of the "spousal share," used to calculate the CSRA, see § 1396r-5(c)(1), the spousal share is not an actual division of the couple's resources, but one step in the process of determining the amount of resources available to the institutionalized spouse. Rather than applying the pre-MCCA system in which the ownership of a couple's resources depended upon the vagaries of nominal ownership and state law, see Johnson, 91 F. Supp. 2d at 761, the relevant question is whether given resources are available to the applicant. An institutionalized applicant need not spend down her spousal share; rather, the couple must spend down any excess resources beyond the CSRA. Any division of the couple's resources at this stage is immaterial because resources held by either spouse are considered available to the institutionalized spouse.

After the Morrises purchased the annuity and engaged in other spend down transfers, OKDHS concluded that they had $47,812 in resources. Because Mr. Morris'

CSRA was $51,906, the amount available to Mrs. Morris pursuant to § 1396r-5(c)(2) was less than zero. The agency's argument that we should count the CSRA as available to Mrs. Morris is contrary to the statutory text.

**4**

We understand the district court's concerns about the annuity provisions in the Medicaid statutes, and we acknowledge the fiscal strain Medicaid can exert on state budgets. Nevertheless, we hold that the purchase of a qualifying annuity renders resources unavailable to the institutionalized spouse even if the annuity is purchased in addition to the community spouse's CSRA. Qualifying annuities are not considered available to the institutionalized spouse pursuant to § 1396p(c)(1)(G) and 20 C.F.R. § 416.1201. The CSRA is rendered unavailable to the institutionalized spouse under § 1396r-5(c)(2). These separate provisions create two different mechanisms by which a Medicaid applicant can render resources unavailable. The statute does not require an applicant to pick one or the other. Nor does any transfer penalty apply to qualifying annuities purchased prior to a determination that the institutionalized spouse is eligible for benefits.

**C**

For the foregoing reasons, we reject both of the rationales offered by OKDHS in its final administrative decision. OKDHS argues, however, that it nonetheless should prevail because Mrs. Morris applied for Medicaid benefits on March 26, 2008, which was before the annuity was purchased. The Morrises raised this issue in their opening brief

by contending that the district court erred in not recognizing that Mrs. Morris applied for Medicaid benefits on April 3, 2008. OKDHS also argues for the first time on appeal that the annuity purchase was not completed until May 2, 2008.

The state of the record before us as to the precise timing of the application relative to the annuity purchase counsels against this court deciding the matter in the first instance.[6] It appears that counsel's letter announcing the Morris' "spend down" and requesting benefits was received by OKDHS on April 8, 2000—the same day that Mr. Morris signed the annuity application. However, OKDHS' final decision indicates that Mr. Morris sent his check for the annuity purchase on April 1, 2008, before the date the agency considered the application filed, April 3, 2008. We also note that agency proceedings continued well after the annuity purchase was indisputably final. Had the agency ruled on this basis, it seems quite clear that Mrs. Morris would have re-applied if re-application was deemed necessary.

The Morrises argue that genuine fact issues exist as to the timing issues that would preclude summary judgment, and that any gap between Mr. Morris' application and the date the annuity was actually purchased would merely delay eligibility. They also request an opportunity to present additional evidence as to this newly disputed issue.

Because the timing of the application relative to the annuity purchase is in dispute

---

[6] The district court distinguished several of the cases cited by the Morrises on the ground that the annuities in those actions were purchased before the plaintiffs applied for Medicaid, but explicitly stated that its analysis would not change even if the annuity had been purchased prior to the filing of an application in this case.

and the district court did not clearly resolve that issue, we conclude that the proper course

is to remand to the district court for proceedings consistent with this opinion.  <u>See</u>

<u>Pacheco v. Shelter Mut. Ins. Co.</u>, 583 F.3d 735, 743 (10th Cir. 2009) (remanding for

unexamined issue to be considered by the district court in the first instance).

## IV

We **REVERSE** the district court's grant of summary judgment in favor of

OKDHS and remand for further proceedings consistent with this opinion.