**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-12774

————————————

L.W.,

   a minor child, by and through his mother and legal
   guardian, KATIE WARD,

*Plaintiff-Counter Defendant-Appellee,*

*versus*


COMMISSIONER OF THE GEORGIA DEPARTMENT
OF COMMUNITY HEALTH,

*Defendant-Counter Claimant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:24-cv-01912-TWT

————————————

Before ROSENBAUM, GRANT, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

This appeal is about whether federal law requires Georgia Medicaid to provide more than 21 hours of nursing care to a three-year-old boy (L.W.) with a rare, life-threatening metabolic disease. The Medicaid Act's Early and Periodic Screening, Diagnostic, and Treatment program requires states to provide eligible patients with private nursing services that are sufficient to correct or ameliorate the recipient's underlying medical condition. 42 U.S.C. § 1396d(r)(5). The district court held that Georgia was likely not providing adequate private nursing services to correct or ameliorate L.W.'s condition and enjoined the state to provide him with additional care. This appeal raises two main questions. First, whether Georgia can deny medically necessary care if it does so based on an otherwise reasonable policy. Second, whether the district court committed clear error when it found that L.W. was due more than 21 hours of weekly nursing care under the statutory standard. We answer both questions "no." Accordingly, we affirm.

## I.

Under the Medicaid Act, the federal government provides financial assistance to states to provide medical care to eligible beneficiaries. The Act requires participating states to provide Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") services to all Medicaid-eligible patients under the age of 21. 42 U.S.C. § 1396d(a). The EPSDT program covers four broad categories of services: screening, vision, dental, and hearing. *Id.* § 1396d(r). The program also includes a catch-all category that requires participating states to provide covered patients with "[s]uch other necessary

health care, diagnostic services, treatment, and other measures described in subsection (a) to correct or ameliorate . . . conditions discovered by the screening services . . . ." *Id.* Subsection (a), in turn, requires participating states to provide private duty nursing services. *Id.* § 1396d(a)(8).

Georgia's Department of Community Health administers the Medicaid program in Georgia. Georgia offers EPSDT services through the Georgia Pediatric Program ("GAPP"), which provides private nursing services to children based on medical necessity. The Department contracts with Alliant Health Solutions to review requests and allocate resources for GAPP services. Alliant reviews requests for initial services and change requests for an adjustment to existing services to determine whether the services requested are medically necessary. Under GAPP's "Policies and Procedures for [GAPP] for In-Home Nursing" manual, a change request to increase the number of private nursing hours "must include some indication that a change in the member's condition has occurred together with signed and dated physician's orders, a Physician Plan of Treatment [] discharge summary, or progress notes . . . ." Doc. 6-1 at 6–7.

L.W. is a three-year-old boy with a rare metabolic disease that interrupts his body's ability to store and use glycogen. Because of the disease, L.W. is at increased risk for episodes of hypoglycemia, which can rapidly lead to lethargy, seizures, and even death if not treated immediately. To maintain appropriate glucose levels, L.W. must receive nutrients via gastrostomy tube (G-tube) every 3

hours—including throughout the night. If a feed is missed, L.W. could die. And if he has been particularly active or if he is ill, L.W.'s glucose levels will often drop, requiring a skilled caregiver to intervene and provide supplemental nutrients at more frequent intervals. L.W.'s caregivers must constantly monitor his glucose levels and respond to any precipitous drops in real-time.

Before moving to Georgia, L.W. and his family lived in Virginia. Through Virginia's Medicaid program, L.W. received 96 hours of care per week—56 hours per week of private nursing services, and 40 hours per week of Consumer Directed Care. Under Virginia's Consumer Directed Care program, the state paid L.W.'s mother to care for L.W.; Georgia does not have a similar program.

Shortly after moving to Georgia in March 2023, L.W.'s mother applied under GAPP for L.W. to receive 56 hours per week of private nursing services. In June 2023, Alliant approved L.W. for 21 hours per week of nursing services. In its approval letter, Alliant noted that its determination was "based on [L.W.'s] current medically necessary needs," which include "[G]-tube feedings, glucose monitoring, and medication administration." Doc. 7-3 at 2. Alliant's review concluded, "[t]he hours allotted should meet HIS needs." *Id.* The letter did not provide any further justification for its determination that 21 hours per week was sufficient to correct or ameliorate L.W.'s condition.

In January 2024, L.W.'s mother (through L.W.'s treating physician, Dr. Neena Champaigne) requested an increase in L.W.'s nursing hours from 21 hours per week to 40 hours per week. In

support of the request, Dr. Champaigne submitted a letter that outlined L.W.'s condition and his required treatment regime. The letter stated that additional nursing hours are "needed to assist with preparation and administration of metabolic formula, management and cleaning of G-tube site and supplies, assessment of tube feeding tolerance, and responding to borderline glucose levels for hypoglycemia prevention." Doc. 6-1 at 9. The letter explained that L.W.'s parents were providing unsustainable levels of care to make up for the lack of nursing hours.

Alliant summarily denied L.W.'s change request. According to Alliant's explanation, the request failed to demonstrate a change in L.W.'s medical condition, which the GAPP manual requires to justify increasing the allocation of skilled nursing services.

In March 2024, L.W.'s mother, still through Dr. Champaigne, again requested an increase in L.W.'s skilled nursing hours—this time, from 21 hours per week to 100 hours per week. Dr. Champaigne's revised letter once again discussed L.W.'s condition and explained his treatment requirements. It also elaborated upon the unsustainability of L.W.'s parents continuing to make up for otherwise insufficient nursing care and the continued risks of inadequate nursing hours on L.W.'s health.

Alliant denied the 100-hour change request in accordance with the GAPP Manual. The denial letter did not discuss how Alliant arrived at its determination that 21 hours per week of skilled nursing services would satisfy the Medicaid Act's requirement that the care correct or ameliorate L.W.'s condition, nor did it respond

to the substance of Dr. Champaigne's letter outlining the medical necessity for additional hours of care. Instead, the letter incorrectly stated that the request was for 40 hours per week of skilled nursing (it was for 100 hours per week), that L.W. had been previously approved for 21 hours per week of "personal support services" (L.W. had been previously approved for 21 hours per week of private nursing services), and that L.W. required insulin injections (in fact, insulin injections could kill L.W.).

Over the months that L.W.'s parents and physician were asking Georgia to increase L.W.'s nursing hours, L.W.'s parents managed to keep L.W. alive. But their success came at a tremendous cost to L.W.'s parents and L.W.'s health. For example, L.W.'s mother regularly experienced sleep deprivation, impacting her attentiveness, alertness, and ability to care for L.W. She often slept through alarms set to wake her up for L.W.'s feeds in the middle of the night, and several times she awoke to find L.W.'s glucose readings dangerously low. At one point, when his parents could not maintain his glucose levels, L.W. required emergency treatment, leading to hospitalization for about one week.

Eventually L.W.'s mother, on L.W.'s behalf, sued the Commissioner of the Georgia Department of Community Health under 42 U.S.C. § 1983 for violating several sections of the Medicaid Act and the Fourteenth Amendment. As relevant here, L.W.'s complaint alleges that the Commissioner's "acts and omissions have denied Plaintiff his right to be furnished the EPSDT services to which he [is] entitled in violation of 42 U.S.C. §§ 1396a(a)(8) & (a)(10)(A)

of the Medicaid Act." Doc. 1 at 32–33. Specifically, the complaint alleges that the Commissioner failed "to provide Plaintiff with private duty nursing services in sufficient amount, duration, scope to achieve the ameliorative purpose of EPSDT in violation[] of 42 U.S.C. §§ 1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5) of the Medicaid Act." *Id.* at 33.

L.W.'s mother also filed a motion for a preliminary injunction to require the Commissioner to provide L.W. more than 21 hours of private nursing services per week. In support of the motion, L.W.'s mother submitted her own affidavit and two affidavits from Dr. Champaigne. L.W.'s mother explained that her efforts to keep L.W. alive with only 21 hours of nursing care were not sustainable. Dr. Champaigne testified, among other things, that "[i]t is medically necessary for L.W. to receive nursing care at night to monitor his glucose levels and to provide his feeds as prescribed," and "[t]he 21 hours per week of nursing approved by Georgia Medicaid does not meet L.W.'s needs." Doc. 2-2 at 5–6. The Commissioner did not submit any evidence to support the position that 21 hours per week is sufficient to provide L.W. medically necessary care. The Commissioner argued that, if the court granted the motion for a preliminary injunction, it should require L.W. to post a bond to cover the cost of the increased nursing hours.

The district court granted the preliminary injunction. As relevant to this appeal, the district court required the Commissioner to (1) provide L.W. with at least 100 hours of private nursing service per week, (2) evaluate L.W.'s future requests under the

"correct or ameliorate" standard, and (3) consider L.W.'s future requests on a case-by-case basis. In support of its order, the district court made several express fact findings, including that L.W.'s condition requires 24 hours per day of supervision, that he must be fed at least every 3 hours, that he requires prompt interventions from skilled caregivers when his glucose levels are low, and that his parents cannot provide the extent of care that he needs. The district court's order did not require L.W. to post a bond.

The Commissioner appealed.

## II.

"We review the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020). "We will find abuse of discretion only when a decision is in clear error, or when neither the district court's decision nor the record provide sufficient explanation to enable meaningful appellate review." *Cox Enters., Inc. v. News-J. Corp.*, 510 F.3d 1350, 1360 (11th Cir. 2007).

## III.

L.W. brings a section 1983 claim, arguing that Georgia's failure to provide sufficient private nursing services to correct or ameliorate his condition violates the Medicaid Act. His complaint alleges violations of several sections of the Act, including section 1396a(a)(8), which guarantees eligible individuals the opportunity to apply for and receive Medicaid services. 42 U.S.C.

§ 1396a(a)(8). We have long recognized that section 1983 creates a private right of action to enforce section 1396a(a)(8).[1] *Doe v. Chiles*, 136 F.3d 709, 719 (11th Cir. 1998). Many of our sister circuits also endorse this type of claim. *See, e.g.*, *Bryson v. Shumway*, 308 F.3d 79, 88–89 (1st Cir. 2002); *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 183 (3d Cir. 2004); *Romano v. Greenstein*, 721 F.3d 373, 377 (5th Cir. 2013); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 448 (6th Cir. 2020).

We set out the standard for assessing the type of claim that L.W. raises in *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1257 (11th Cir. 2011). There, we evaluated Georgia's scheme for determining how many hours of private nursing care are medically necessary for individual Medicaid patients. We held that "the state may limit required private duty nursing services based upon a medical expert's opinion" so long as the limitations "do not discriminate on the basis of diagnosis, type of illness, or condition" and "the services provided are sufficient in amount and duration to reasonably achieve the purpose" of correcting or ameliorating the patient's condition. *Id.* (citation modified). Importantly, we instructed that "[w]hen a state Medicaid agency has exceeded the bounds of its authority by adopting an unreasonable definition of medical necessity

---

[1] In his reply brief, the Commissioner argues for the first time that we should reconsider our precedents and hold "that the relevant provisions of the Medicaid Act are not enforceable via § 1983." Reply Br. at 16. That argument is not properly before us, and we do not address it. We routinely "refuse[] to consider issues raised for the first time in an appellant's reply brief." *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004).

or by failing to ensure that a required service is sufficient in amount, duration, and scope to reasonably achieve its purpose, aggrieved Medicaid recipients have recourse in the courts." *Id.* at 1259 (citing 42 C.F.R. § 440.230(c), (d)) (citation modified). Ultimately, where "[t]he record presents material issues of fact over what amount of private duty nursing hours are medically necessary," both sides can present evidence, "and the factfinder at trial will decide." *Id.* at 1258.

A preliminary injunction is an appropriate remedy when the moving party establishes that: "(1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez*, 978 F.3d at 1270–71 (citation modified). "The third and fourth factors merge when, as here, the government is the opposing party." *Id.* at 1271 (citation modified).

We now address each factor in turn, starting with the likelihood of success element before turning to the irreparable injury and equity balancing elements. We also address the bond requirement.

*A.*

The Commissioner advances three arguments against L.W.'s likelihood of success on the merits. First, the Commissioner argues that Georgia can establish and rely upon policies that deny L.W. medically necessary care as long as those policies are

reasonable and consistent with the Medicaid Act in the abstract. Second, the Commissioner argues that the district court erred when the district court held that Georgia was likely not providing medically necessary care to L.W. And third, the Commissioner argues that L.W. cannot bring this claim in federal court because he did not exhaust all state administrative remedies. As we discuss below, none of the Commissioner's arguments are convincing.

1.

We will start with the Commissioner's argument that it need not meet the statutory standard if it relies on a reasonable regulation to deny medically necessary care. The Commissioner denied L.W.'s request for an increase in hours by reference to a policy against changes without a showing of a change in medical condition. He claims that this "change" policy is reasonable. In the Commissioner's view, L.W. cannot challenge the application of the policy. Instead, because the underlying policy is reasonable, the Commissioner says that L.W. must live (or die) with the outcome. In response, L.W. argues that Georgia Medicaid must provide the statutorily required minimum level of care, regardless of the reasonableness of its policies in the abstract.

We agree with L.W. We need not determine whether Georgia Medicaid's "change" policy is reasonable in the abstract because, even if the policy is reasonable, the care that Georgia Medicaid provides must still meet the statutory standard. The Commissioner's contrary argument is wrong for three reasons.

First, in many respects, the Commissioner's argument simply misunderstands L.W.'s claim. L.W. is arguing that Georgia Medicaid has *never* provided enough nursing hours to meet the statutory standard. L.W. says that 21 hours of nursing care is not a "sufficient amount, duration, [or] scope to achieve the ameliorative purpose of EPSDT" and that the Commissioner's application of GAPP policies to *his individual request* is "arbitrary, capricious, and unreasonable." Doc. 1 at 33. Georgia's reliance on the reasonableness of its "change" policy is not responsive to L.W.'s claim that Georgia has been violating the statutory standard from the very beginning.

Second, the Commissioner's legal position is inconsistent with the text of the Medicaid Act. The Medicaid Act expressly requires states to provide EPSDT beneficiaries with adequate care to correct or ameliorate their conditions. 42 U.S.C. § 1396d(r)(5). And, in doing so, states must ensure that the care that they provide is "sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b). States, of course, have "broad discretion" to adopt policies to meet these requirements, so long as those policies are "reasonable" and "consistent with the objectives of the Act." *Beal v. Doe*, 432 U.S. 438, 444 (1977) (citation modified). But the text of the Act requires a state to provide care that is sufficient to correct or ameliorate individual patients' underlying conditions in *all* cases, not some cases.

Third, our precedents establish that Medicaid beneficiaries may challenge the state's determination of their nursing needs on

an individual, recipient-by-recipient basis. We expressly recognized in *Moore* that a patient may litigate whether the "application of the GAPP plan to [the patient's] specific medical condition . . . violates the Medicaid Act because" it provides fewer hours than are "medically necessary to correct or ameliorate [the patient's] condition." 637 F.3d at 1257, 1255. We noted in *Moore* that the plaintiff had not argued that any regulation was "an unreasonable policy *per se* or on its face." *Id.* at 1256. But we nonetheless remanded to the district court to determine whether, as a matter of fact, the Medicaid program was providing sufficient care to the plaintiff on an as-applied basis. *Id.* at 1258. We reasoned that Congress had not "conferred the 'final arbiter' role to the state." *Id.* at 1259. We held that, "[w]hen a state Medicaid agency has exceeded the bounds of its authority by adopting an unreasonable definition of medical necessity *or by failing to ensure that a required service is 'sufficient in amount, duration, and scope to reasonably achieve its purpose,'* aggrieved Medicaid recipients have recourse in the courts." *Id.* (emphasis added) (quoting 42 C.F.R. § 440.230(b)). When assessing the latter kind of claim, we explained that the patient's burden is to "establish by a preponderance of the evidence" that more hours than Medicaid has authorized "are medically necessary." *Id.* at 1258.

We made the same point again in *M.H. v. Commissioner*. 111 F.4th 1301 (11th Cir. 2024). In *M.H.*, a putative class of Medicaid recipients challenged Georgia's policies for determining how many hours of private nursing care are medically necessary for EPSDT beneficiaries. *Id.* at 1304. In ruling on the plaintiffs' claims, the district court held that the regulations violated the Medicaid Act and

enjoined the state from applying them. *Id.* at 1307. On appeal, we reversed, holding that the state's policies were, in fact, reasonable and in keeping with the Act's requirements. *Id.* at 1310–11. Nonetheless, in doing so, we recognized that "[t]he only issue before us [was] the sufficiency" of the state's policies—not whether the number of approved hours satisfies the Act's standard—and we reiterated that, despite the reasonableness of the policies, a Medicaid recipient could "argue that the number of approved hours . . . does not satisfy [the Act's] standard." *Id.* at 1310.

In short, even if a state's regulation is reasonable because it helps the state to administer most cases, the state cannot justify an outcome contrary to federal law by reference to an otherwise reasonable regulation. Just like the plaintiff in *Moore*, L.W. has "recourse in the courts" to contest the program's failure to provide him with sufficient care to correct or ameliorate his condition. 637 F.3d at 1259.

2.

The Commissioner next argues that the district court erred in finding that L.W. was likely not receiving sufficient medical care. Because we have said that this determination is a question of fact, *Moore*, 637 F.3d at 1258, we review it for clear error. *See Gonzalez*, 978 F.3d at 1270.

Clear error is a hard standard to meet. We will find clear error only when, "although there is evidence to support" the district court's conclusion, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S.*

*Gypsum Co.*, 333 U.S. 364, 395 (1948). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985).

We cannot say that the district court clearly erred in finding that 21 hours was likely insufficient to correct or ameliorate L.W.'s condition. The district court's factfinding has support in the record. L.W. received 96 hours of care in Virginia. Since moving to Georgia and having his hours of care reduced to 21, L.W.'s glucose level has dropped dangerously low several times, putting him at risk of death. And, in their affidavits, L.W.'s mother and Dr. Champaigne pointed to specific attributes of L.W.'s condition that require more nursing care to ameliorate his condition. In response, the Commissioner offered no evidence disputing that more than 21 hours is medically necessary for L.W., instead electing to rest on his argument that the change policy is reasonable.

The Commissioner contends that the fact L.W.'s condition has remained stable under the 21-hour regime is enough for us to say that the district court erred in finding that more hours are medically necessary. We disagree. First, as L.W.'s mother and Dr. Champaigne both testified, L.W.'s parents have undertaken unsustainable efforts to maintain L.W.'s condition under the 21-hour regime, and the lack of nursing care has seriously jeopardized L.W.'s health. Second, it does not follow logically that 21 hours of private

nursing support is all that is medically necessary just because L.W. has not yet suffered adverse consequences from that level of care. At the very least, nothing requires the district court to draw that inference in favor of the Commissioner. Although another fact-finder may have weighed the evidence differently, we are not "left with the definite and firm conviction that a mistake has been committed." *Gypsum*, 333 U.S. at 395.

3.

We will briefly address the Commissioner's third merits argument. The Commissioner claims that "the district court should not even have heard this case" because L.W. did not exhaust his administrative remedies. But our caselaw says otherwise. In *Alacare, Inc.-North v. Baggiano*, we held that the Medicaid Act does not require exhaustion of state remedies as a prerequisite to bringing a section 1983 action. 785 F.2d 963, 968 (11th Cir. 1986), *cert. denied*, 479 U.S. 829 (1986). Since then, many similar suits alleging violations of the Medicaid Act have been brought under section 1983 in our Circuit without first exhausting state administrative remedies. *See, e.g.*, *Moore*, 637 F.3d at 1229; *Garrido v. Dudek*, 731 F.3d 1152, 1156 (11th Cir. 2013); *M.H.*, 111 F.4th at 1306. And other circuits have also concluded that the Act does not impose an exhaustion requirement on section 1983 enforcement suits. *See, e.g.*, *Roach v. Morse*, 440 F.3d 53, 56–58 (2d Cir. 2006); *Romano*, 721 F.3d at 376; *Waskul*, 979 F.3d at 445; *Houghton ex rel. Houghton v. Reinertson*, 382 F.3d 1162, 1167 n.3 (10th Cir. 2004). Because our caselaw

24-12774                Opinion of the Court                17

establishes that administrative exhaustion in the Medicaid context is not required, we reject the Commissioner's argument.

*B.*

Having addressed the likelihood of success on the merits, we turn now to the remaining preliminary injunction considerations.

We cannot say that the district court abused its discretion in analyzing the irreparable harm and equity balancing elements. Given the district court's factual finding that L.W. requires 24 hours per day of supervision from skilled caregivers, it is not unreasonable to conclude that 21 hours per week (or 3 hours per day) of skilled nursing care is insufficient to meet L.W.'s medical needs. The harm posed by the state's insufficient care is irreparable because it concerns L.W.'s health. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (stating that an injury is irreparable if it "cannot be undone through monetary remedies"). Indeed, lacking sufficient care, L.W.'s condition can quickly decline, potentially causing death— the ultimate irreparable harm. Likewise, the balance of equities favors L.W. Any financial obligations that the state incurs because of the injunction are not outweighed by the potentially catastrophic harm L.W. faces. Similarly, the injunction serves the public interest by requiring the state to follow the law and meet its obligation under the Medicaid Act. *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest . . . .").

18                    Opinion of the Court                    24-12774

Finally, the Commissioner argues that the district court erred in not requiring a bond per Federal Rule of Civil Procedure 65(c) or explaining why it was waiving a bond. We disagree. Rule 65(c) grants the district judge broad discretion to set "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Our caselaw establishes that the district court may properly determine that no bond is required and set the security amount at $0. *See BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005). And, if the record provides sufficient explanation for appellate review, we need not remand "for the district court to state on the record what everyone already knows." *United States v. Steiger*, 99 F.4th 1316, 1327 (11th Cir. 2024).

Although we would have preferred the district court to explain why it chose not to impose a bond, we think that the record is clear enough on this point to enable meaningful appellate review, and we believe it was within the district court's discretion to impose a $0 bond amount. Georgia asked the court to require L.W. to post a bond in the amount of *at least* $64,716.80—the sum of the additional Medicaid funds that the state expected to pay out over a period of 20 weeks. L.W. argued that requiring a substantial bond for a Medicaid-eligible child seeking to enforce the EPSDT's mandate would make enforcing that mandate cost prohibitive. The record reflects that the district court agreed with L.W. The district judge stated that he was "not going to base [his] decision upon speculation about wasting the state's resources." Doc. 9 at 33. Under

these circumstances, we cannot say that the district court abused its discretion in failing to set a bond at more than $0.

## IV.

For the foregoing reasons, the district court's entry of a preliminary injunction in favor of L.W. is **AFFIRMED**.

24-12774        GRANT, J., Concurring in the Judgment            1

GRANT, Circuit Judge, concurring in the judgment:

The district court granted L.W.'s request for a preliminary injunction. My colleagues affirm, and I agree—L.W. needs more care. But I respectfully part ways with them on how to handle the rules-based justification for denying L.W.'s change request.

The majority concludes that a State Medicaid program may not deny—even temporarily, it seems—medically necessary care by applying an otherwise reasonable policy. Maj. Op. at 14. I am not sure that's the right answer as a legal matter. But in my view we should not consider that question here, because the cited change-request policy does not appear in the Georgia Department of Community Health's policy documents. Nor is it referenced in the written rejection of L.W.'s change request. But without knowing what the policy is, I cannot evaluate whether it is reasonable, let alone whether a denial under it would be permissible.

Because these uncertainties leave us working in the abstract rather than the concrete, we should stick to deciding whether L.W. is getting enough care rather than venturing into broader questions. Any policy leading to the outcome here—denying L.W. additional care—may rightly seem suspect. But I fear that the majority's approach, though understandable against the backdrop of this case, will have broader consequences. So while I do reach the same bottom line—that the district court did not abuse its discretion in ruling for L.W.—I would take a different route to get there, with fewer stops along the way.

2              GRANT, J., Concurring in the Judgment        24-12774

I respectfully concur in the judgment.

⋆        ⋆        ⋆

Throughout this appeal, the Department has sought to justify its denial of L.W.'s request on the basis of a policy that, it says, requires Georgia's Medicaid program to deny any change request that does not describe a change in the patient's condition. The problem? We have no direct evidence that such a policy exists. The Department cites the program's manual, but never quotes its language. I will. Though the term "change request" is sprinkled throughout the manual, the procedures for making such a request can be found in Section 803.1B:

> Revision or Change in Approved Services (Change Request)
>
> Effective January 1, 2023, *if there is a change in the member's condition*, a change request must be submitted within five (5) days of the change in status.
>
> Effective January 1, 2012, *a change request must be submitted through the GAMMIS Medical Review portal for requests for a change in hours (increase, decrease, etc.) during a current certification period. Change requests due to a change in the member's condition* such as an exacerbation of the member's illness or an improvement in the member's condition such as de-cannulation, wearing off the ventilator, etc. *should be submitted with[in] five (5) days of the change in condition* and will be expedited by the Medical Review Team when necessary. Change requests or emergency admissions will be reviewed within five (5) days of submission of required information for review by the Medical Review Team.

24-12774      G<small>RANT</small>, J., Concurring in the Judgment              3

Providers will also need to submit/attach a hospital discharge summary -*or*- updated PPOT, or latest progress notes. ***The need for a change in approved services will be evaluated based on medical necessity for skilled nursing and/or personal care support and the overall medical condition of the member.*** The request must be submitted with signed and dated physician orders or PPOT discharge summary or progress notes if an increase in hours is requested. Progress notes should include the services/number of hours requested by the physician.

The Alliant Health Solutions Medical Review Unit will issue a Letter of Notification (LON) for the nursing agency. ***Change requests that do not document the reason for the change will not be considered.***

Ga. Dep't of Cmty. Health, *Part II: Policies and Procedures for Georgia Pediatric Program (GAPP) In-Home Nursing* § 803.1B (rev. Apr. 1, 2024) (emphasis added).[1]

Reviewing the manual shows why the Department never offered a quotation—the manual does not describe the policy that was supposedly in effect. Worse still, it is poorly drafted and hard to make sense of. I do not attempt to untangle its meaning here,

---

[1] This is not the most recent version of the manual available, but is the one that was in effect when L.W.'s change request was denied. This version has a discrepancy about whether the relevant provision should be numbered 803.1B (as the table of contents indicates) or 803.2B (as the provision itself indicates), but I cite it as Section 803.1B because that is how the Department refers to it.

4              GRANT, J., Concurring in the Judgment        24-12774

but I find it instructive to highlight some of the uncertainty raised by its repetitive structure and odd phrasing.

The first paragraph requires that "*if* there is a change" in condition, the "change request must be submitted within five (5) days." Given that this five-day time constraint apparently does not apply to *all* change requests, what other types of requests does the manual contemplate? Similarly, the second paragraph reiterates the five-day deadline for requests based on a change in condition, but not before noting that *all* change requests must be submitted through a certain review portal.

The third paragraph indicates how change requests will be evaluated, including what type of physician documentation is required. It never mentions a change in condition. Instead, the "need for a change in approved services will be evaluated based on medical necessity for skilled nursing and/or personal care support and the overall medical condition of the member." Could a program participant reasonably believe based on this language that change requests lacking a change in condition may be evaluated and—at least sometimes—granted? I would think so.

Finally, the last paragraph explains that change requests "will not be considered" unless they "document the reason for the change." What it does *not* say is that the reason must be a change in the member's condition, or that change requests that fail to document such a change will not be considered. But whether those restrictions may have been intended is more than I can tell. And probably more than those making change requests can tell, too.

24-12774        GRANT, J., Concurring in the Judgment          5

The only evidence supporting the existence of a change-in-condition requirement is an affidavit from a pediatric review nurse. The affidavit no doubt implies that a change-in-condition requirement was applied to L.W.'s request—but it never affirmatively says so. And whether that nurse reviewed (and denied) L.W.'s change request, or simply reviewed the file later, is not clear. Either way, her affidavit was prepared for the purposes of this litigation almost six weeks after the lawsuit was filed.

One after-the-fact affidavit with more implications than conclusions is a thin evidentiary reed—especially when the notice-of-determination letter received by L.W.'s parents fails to show that a change-in-condition requirement was applied. To start, that letter says that his participation in the program was given "careful consideration." But that is inconsistent with the Department's suggestion that change requests not outlining a change in condition would not be considered. The letter also concludes that the hours already approved would meet L.W.'s "current needs," which was neither true nor aligned with a no-change-in-condition denial. A series of errors plagues the letter, too. The most serious of these is the statement that L.W. needed insulin injections—he didn't and they could have killed him. *See* Maj. Op. at 6.

To be fair, the letter does go on to state that L.W.'s documentation did not "indicate a change in [his] condition." So perhaps that was at least a factor in the decision. But the correspondence also notes that L.W. did not identify any "new medically necessary skilled needs"—which sounds different than a

change in condition.  Finally, it explicitly lays out a policy with no change-in-condition requirement: "Change requests that do not document the reason for the change will not be considered."  Of course, L.W. offered several "reasons" that he needed more hours than he was getting.  Among them were his risk for episodes of hypoglycemia which could "rapidly lead to lethargy, seizures, obtundation and death if not treated"; his need to be fed at least every three hours round-the-clock through a gastrostomy tube; his parents' full-time jobs and their need to care for another child; and his need for "an alert and awake caregiver who isn't at risk to sleep through an alarm in the middle of the night."  For all these reasons, the notification letter undermines the Department's claim that a simple change-in-condition requirement was applied to L.W.'s request.

In the end, then, we have a change request that at least arguably met the requirements, coupled with a rejection of that request because the Department now says it failed to follow a policy—one that does not appear in the manual and is cited nowhere outside this litigation.  Given these discrepancies, I am unsure about what the Department's real policy is.  Nor do I have any idea what policy, if any, was applied to L.W.'s change request.

This uncertainty presents a host of problems, two of which bear special emphasis.  *First*, the practical: Georgia Medicaid recipients need to know what the rules are.  If the written policy asks for one thing, but the Department requires another, unwary families will miss out on care that should be provided under the

24-12774      GRANT, J., Concurring in the Judgment              7

law. *Second*, the legal: there is a real risk in deciding, as the majority does, rules for what effect *reasonable* policies can have on Medicaid coverage, when all we have here is a policy that may or may not exist. And which perhaps would be *un*reasonable if it did.

No doubt, the Department has a duty to provide care that meets federal statutory requirements—care that is "necessary" to "correct or ameliorate" illnesses. 42 U.S.C. § 1396d(r)(5); *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1255 (11th Cir. 2011). But the Medicaid statute also requires each State's program to set "reasonable standards" for determining "the extent of medical assistance under the plan." 42 U.S.C. § 1396a(a)(17); *Beal v. Doe*, 432 U.S. 438, 444 (1977). How those two imperatives interact is a complicated, high-stakes question, and also one that it is crucial to get right.

After all, the states have discretion in setting reasonable regulations for their own systems, and "Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs." *See Alexander v. Choate*, 469 U.S. 287, 303 (1985). "The regulatory criterion," we have explained, is not whether the rules provide ideal treatment in all cases, "but whether the plan is sufficient for reasonable accomplishment of its purpose." *Curtis v. Taylor*, 625 F.2d 645, 653 (5th Cir. 1980).[2] As a result, states are free to place reasonable

---

[2] Decisions of the Fifth Circuit issued before October 1, 1981, are binding on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

"quantity and durational limits on required services," and "reasonable" means "adequate to serve the medical needs of most of the individuals eligible for Medicaid assistance." *Moore*, 637 F.3d at 1246; *Curtis*, 625 F.2d at 653. In fact, we have said that sometimes it may be "reasonable to refuse to approve additional hours of skilled-nursing services even though those services would also improve the patient's condition." *M.H. ex rel. Lynah v. Comm'r of the Ga. Dep't of Cmty. Health*, 111 F.4th 1301, 1311 (11th Cir. 2024).

Do the Georgia Medicaid program's change-request rules strike the right balance? On this record, I cannot say. Indeed, I cannot even say what they are, or how they fit into the larger policy structure. A suite of reasonable rules providing for periodic review might well incorporate various limits on the ability of beneficiaries to make change requests. Same goes for rules requiring certain documentation to support such requests. But whatever reasonable standards might look like, the Department has not shown that they were operative here. Instead, on this record—where conflicts between the evidence and the arguments obscure the basis for L.W.'s denial—it is impossible to conclude that the decision was based on a reasonable policy, or any policy at all.

⋆　　⋆　　⋆

Whether a State Medicaid program can lawfully implement reasonable rules that may sometimes, for some people, result in a temporary miss on the standard of care is an important question. But it is not one fairly presented here because the litigation arguments do not match the record. What that record does show

24-12774       GRANT, J., Concurring in the Judgment            9

is that the State is not meeting its responsibilities to L.W., so I concur in the judgment.